THE EAU CLAIRE CANNING COMPANY

*v.*

THE WESTERN BROKERAGE COMPANY.

*Opinion filed February 21, 1905.*

1. APPEALS AND ERRORS—*when receivers may sue out a writ of error in name of corporation.* Receivers of an insolvent foreign corporation may prosecute a writ of error in this State in the name of the corporation to reverse a judgment recovered against it before its dissolution, where such course is authorized by the laws of the foreign State and by an order of the court having jurisdiction of the receivership, and is not against the public policy of Illinois.

2. CONTRACTS—*when bought and sold notes establish a contract.* Where a broker representing both parties enters no memorandum of the sale in his book or the book is not produced, the bought and sold notes together, if they agree, establish the contract.

213—36

3. SAME—*immaterial variance between bought and sold notes does not vitiate contract.* An immaterial variance between bought and sold notes does not vitiate the contract, nor does a material variance if the same may be explained by the usages of trade.

4. SAME—*effect of customs and usages on contract.* One employing a broker to act for him in a particular market must be taken as intending that the business will be done according to the usages and customs of that particular market.

5. SAME—*what is not a material variance between bought and sold notes.* That the note delivered to the purchaser evidencing a broker's sale of canned tomatoes contained the words "usual guaranty against swells and quality" and "terms regular," which were not in the note delivered to the seller, does not avoid the contract, where the evidence shows that all sales according to the usage of the particular market were made under such terms unless otherwise provided, and that the seller knew of such usage when he employed the broker.

6. SAME—*bought and sold notes are to be construed together.* Bought and sold notes executed at the same time and evidencing the same transaction will be construed as one instrument, and in so doing, force is to be given, if possible, to the language of both.

7. SAME—*when contract will be treated as ratified.* A principal who fails to repudiate a sale by his broker within a reasonable time after receiving the sale ticket evidencing the transaction must be held to have ratified the transaction and is bound thereby.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JONAS HUTCHINSON, Judge, presiding.

This is an action of assumpsit, brought by writ of attachment November 11, 1901, in the Superior Court of Cook county by the defendant in error, the Western Brokerage Company, a corporation organized under the laws of Iowa, against the plaintiff in error, the Eau Claire Canning Company, a corporation organized under the laws of Michigan, (the latter corporation being engaged in canning tomatoes and other vegetables and fruits in the city of Eau Claire in Michigan,) to recover damages for breach of contract. The declaration consisted of two special counts and three com-

mon counts for money laid out and expended, for money had and received to the use of the plaintiff, and for balance due on account stated. The defendant pleaded the general issue, and later by leave of court filed an additional plea, denying the execution and delivery of the "writings in said declaration and the several counts thereof mentioned." By agreement of parties a jury was waived, and the cause was submitted to the court for trial upon an agreed statement of facts, with a reservation to each party of the right to introduce further testimony, not inconsistent with the stipulated and agreed statement of facts.

On July 24, 1903, the trial court found the issues for the plaintiff, and assessed plaintiff's damages at $3500.00, and costs. An appeal was taken to the Appellate Court for the First District from this judgment, and the Appellate Court has affirmed the judgment. An appeal was taken to this court from the judgment of affirmance so entered by the Appellate Court, but said appeal was dismissed, and the present writ of error has been sued out from this court by the present plaintiff in error for the purpose of reviewing said judgment of the Appellate Court.

The first special count of the declaration charges that, on June 24, 1901, at Chicago, the plaintiff below, defendant in error here, at the request of the defendant below, plaintiff in error here, bargained for and agreed to buy of the defendant 5000 cases of No. 3 standard tomatoes upon the following terms and conditions: Said 5000 cases of standard No. 3 tomatoes should be delivered to plaintiff within a reasonable time thereafter free on board cars at the factory of defendant at Eau Claire in Michigan, and the plaintiff should pay for the same the sum of seventy-five cents per dozen, less fifteen cents per cwt. and less one and one-half per cent discount for cash; that, in consideration of the premises, the defendant on the day aforesaid, at the said city of Chicago, promised that defendant would, within a reasonable time, ship to such persons as plaintiff might direct said amount of

tomatoes; that, although a reasonable time for that purpose has long since elapsed, and plaintiff was always, during and since that time, ready and willing to accept a delivery of the tomatoes aforesaid, and to pay for the same as aforesaid, yet the defendant did not, nor would within such reasonable time, or afterwards, procure to be delivered or shipped for the plaintiff, the tomatoes aforesaid, or any tomatoes whatsoever; but refused and still refuses so to do, to the damage of the plaintiff, etc.

The second special count alleges that, on the day and year aforesaid, the plaintiff, at the request of the defendant, made by and through its duly authorized agent and broker, to-wit, W. S. Knight & Co., a bargain with the defendant to buy of it, and defendant then and there sold to the plaintiff a large amount of standard tomatoes, to-wit, 5000 cases, to be delivered by the defendant free on board cars at the city of Eau Claire, and to be paid for by the plaintiff on the delivery thereof, at the rate of seventy-five cents per dozen, less fifteen cents per cwt. freight allowance, and less a deduction of one and one-half per cent for cash; that in consideration thereof said defendant, through its agent and broker aforesaid, promised the plaintiff to deliver said tomatoes to it, as aforesaid, when the tomatoes of 1901 were packed; and although the tomatoes of 1901 had long since been packed, and although the time for the delivery of said tomatoes, specified in the contract aforesaid, had long since elapsed, and although the plaintiff had always been ready to accept and receive the said tomatoes, and to pay for the same at the prices aforesaid, yet the defendant did not nor would it make a delivery of said tomatoes, but refused so to do.

The facts embodied in the stipulation above named, and shown by the testimony introduced in connection therewith, are substantially as follows:

During the month of May, 1901, and before the 24th day of said month, R. W. Reese, secretary of the Eau Claire Canning Company, called upon William H. Eagle, president

of W. S. Knight & Co., an Illinois corporation, engaged in business as wholesale brokers and commission merchants at 42 River street, in Chicago, stating that he, Reese, was connected with the Eau Claire Canning Company of Michigan and wished W. S. Knight & Co. to sell his goods for him as brokers, saying, however, at that time that the canning company had not packed anything, and that, when they were ready to pack, they would quote prices to Knight & Co. The defendant in error, a corporation of Iowa, engaged in the brokerage business, had an office in Chicago, and had in its employ, as buyer, one Dudley Smith, who was authorized to make contracts and purchases on its behalf; Reese was authorized by the canning company to write and execute on its behalf the letters hereafter referred to, and to bind the company by the statements contained in said letters, and to negotiate in its behalf the transactions hereinafter mentioned, and to represent it in all matters and things therein set forth. There ensued thereafter certain correspondence between the said Knight & Co. and plaintiff in error.

On May 24, 1901, plaintiff in error, by Reese its secretary, wrote W. S. Knight & Co. a letter, reminding them that Reese had called upon them a few days before regarding the canned goods arrangement, sales, etc., and making inquiry regarding the kind of boxes to be used in the shipping of their goods, and stating that they had been told that brokers preferred a certain kind of box, and requested that they should hear from Knight & Co. with reference to that subject. On May 25, 1901, Knight & Co. replied, giving their opinion as to the kind of box to be used, and saying: "Future tomatoes are being offered here now at seventy-five cents regular terms, delivered, but the trade are not taking hold of them very freely at present. When you are ready to name prices on your pack, we hope you will hand them to us promptly." On June 13, 1901, W. S. Knight & Co. wrote plaintiff in error saying: "If we hear in time, think we can sell one of our largest grocery houses here 2500 cases of

your tomatoes for future delivery, if you will make the price seventy-two and one-half cents regular terms delivered here, guaranteeing the quality strictly standard, goods to be shipped when packed," and, after advising plaintiff in error to take seventy-two and one-half cents, the said letter closes as follows: "If you want this order, please write us promptly on receipt of this letter." On June 14, 1901, the plaintiff in error, by Reese, its secretary, replied to the last letter as follows: "Your favor of the 13th inst. just at hand. Considering the poor outlook for a tomato crop, and believing the output will be materially cut short, we cannot accept your offer of seventy-two and one-half; we will make you an offer, however, of seventy-five cents f. o. b. at our factory in lots of 5000 cases and 2500 cases. Trusting we may hear favorably on this proposition, we remain," etc. On June 17, 1901, Knight & Co. replied to the last letter as follows: "We are to-day in receipt of your favor of the 14th and note you do not care to sell tomatoes under seventy-five cents, f. o. b. factory. It is impossible to obtain this price, as there are a number of packers in the market trying to sell at seventy-five cents delivered here, and in some cases they are willing to take seventy-two and one-half. Our buyer is Sprague, Warner & Co., who, as you know, are the largest grocers here, and it would be very desirable to get your goods in with them. We have succeeded in getting them to renew their offer of seventy-two and one-half cents delivered here, which is the best they will do. We trust you will reconsider the matter, and enter this order for 2500 cases for them." On June 19, 1901, plaintiff in error replied to W. S. Knight & Co. as follows: "In reply to your letter of the 17th inst. we beg to state that we have been offered on 5000 cases three pound tomatoes seventy-five cents delivered. We are willing to make the concession to our former letter regarding the freight, and will furnish them to your house f. o. b. Chicago, at above quotation. Considering the backward condition of the crop we think prices will advance in-

stead of decrease, and as we are anxious to market our pack through your house, we trust you will be able to reach the figures above named."

On June 20, 1901, Knight & Co. replied to said letter of June 19, as follows: "Replying to your favor of the 19th. We are unable to sell Sprague the tomatoes at seventy-five cents delivered, neither can we find any other buyer in this market at this price. We now have a proposition from an Iowa jobber, who offers seventy-five cents less fifteen cents per hundred freight for 5000 cases. This concern have several stores in Iowa, and they would be good people to get your goods in with. Please let us know the rate of freight you can get from Eau Claire to Chicago, also the Mississippi and Missouri river points. Please let us know promptly whether or not you will accept this offer." On June 21, 1901, plaintiff in error, by Reese, its secretary, wrote Knight & Co., in reply to said letter of June 20, as follows: "Referring to yours of the 20th inst. Will state that, if you can secure order for 5000 cases three pound tomatoes at seventy-five cents we will allow fifteen cents per cwt. freight."

The last letter of June 21, 1901, was received by W. S. Knight & Co. on Saturday, June 22, 1901, and on Monday, June 24, Mr. W. H. Eagle, president of Knight & Co., called upon Dudley Smith, the buyer of the Western Brokerage Company, and presented to said Smith the letter of June 21, aforesaid. The testimony of Eagle shows that, before writing the letter of June 20, 1901, to the plaintiff in error, he had secured from Smith an offer in behalf of the Western Brokerage Company in the form transmitted by him to the canning company in the letter dated June 20, 1901, the letters from Knight & Co. to the Eau Claire Canning Company having been written by said Eagle. Eagle also testifies that, when he called upon Smith on Monday, June 24, 1901, "I showed him the letter and he accepted the proposition," referring to the letter from the plaintiff in error dated June 21, 1901.

Thereupon, on Monday, June 24, 1901, upon the acceptance by Smith of the proposition contained in the letter of June 21, 1901, the following memorandum or sale ticket was given by Eagle, as representing W. S. Knight & Co., to Smith, as representing the Western Brokerage Company, to-wit:

"CHICAGO, *June 24, 01.*
"Sold to Western Brokerage Co.,
    For account of Eau Claire Pkg. Co., Eau Claire, Mich.
"5000 c/s Stand. 3th tomatoes 75 f. o. b. factory, less 15c per cwt. frt. allowance. Cash, less 1½%. Pack of 1901. Shipped when packed.
W. S. KNIGHT & Co."

At the same time Dudley Smith delivered to Eagle a memorandum in the following form:

"WESTERN BROKERAGE Co., 42 RIVER STREET,
CHICAGO, *June 24, 1901.*
"W. S. Knight & Co.—No. 659.—for Western Bro. Co.
    Bought of Eau Claire Packing Co., Eau Claire, Mich.
    Charge to Western Brokerage Co., Chicago.
    Shipping instructions when packed. When ready to ship.
    Terms regular, less 1½%, cash 10 days.
    Charge and invoice to parties named above but send bill of lading and invoice to Western Brokerage Co., 42 River street, Chicago, for their O. K.
    5000 cases Std. 3th tomatoes at 75 cts. doz. f. o. b. factory, with an allowance of 15 cts. cwt. on freight.
    Pack 1901—Usual guarantee against swells and quality.
    For Western Brok. Co.
    Brokerage: Regular.     WESTERN BROKERAGE Co.,
Per DUDLEY SMITH."

Thereafter on the same day W. S. Knight & Co. sent to plaintiff in error the following telegram, to-wit:

"*June 24, 1901.*
"*To Eau Claire Packing Co., Eau Claire, Mich.:*
    "Letter received. Have sold five thousand tomatoes, your price, terms.
W. S. KNIGHT & Co."

It was stipulated between the parties that, although the telegram was addressed to the Eau Claire Packing Company, it was received by the Eau Claire Canning Company, plaintiff in error.

On the same day W. S. Knight & Co. wrote the following letter to the plaintiff in error, to-wit:

"CHICAGO, *June 24, 1901.*
*"The Eau Claire Canning Co., Eau Claire, Mich.:*

"GENTLEMEN—Replying to your favor of 21st. We wired you to-day that we had sold the 5000 cases of tomatoes, for which we now enclose sale ticket. We enclose a card showing the different wholesale grocery houses these people represent; and they will probably ask you to ship part of the lot to several of them when they are ready.

"We presume you are working up the matter of freight rates to the different points we asked for last week, and that we will hear from you very soon.

"It is possible we can sell 5000 cases more on this basis, and if you care to have us do so, please let us know by return mail.

"Yours truly,
W. S. KNIGHT & Co.

"P. S.—Please wire us if you will sell 5000 more same price."

The sale ticket enclosed in the last letter, dated June 24, 1901, was in the following terms:

"MEMORANDUM,
"CHICAGO, *June 24, 1901.*
Sales by                                For account of
W. S. Knight & Co.                 Eau Claire Packing Co.
As per telegraphic advices.
Western Brokerage Co.

5000 cases 3℔ tomatoes. 75 cts. F. o. b. factory. Less 15 cts. per 100 lbs. freight allowance, cash less 1½ per cent. To be shipped when packed, pack of 1901. Season's guarantee on swells."

On June 26, 1901, the Eau Claire Canning Company, by Reese, its secretary, wrote as follows:

"EAU CLAIRE, MICH., *June 26, 1901.*
*"Mess. W. S. Knight & Co., Chicago, Ill.:*

"GENTLEMEN—Referring to yours of recent date, will say we have looked up freight rates to Mississippi river points, and find that on car lots they are 17 cts. per cwt. * * * Have been looking up crop prospects regarding outlook for tomatoes, and find it to be decidedly poor. Out of a contract of nearly 200 acres of tomatoes, we will not be able to secure more than one-half that amount, and we do not feel like contracting any farther futures less than 75 cts. straight f. o. b. at our factory. Should a change for the better come, will let you know.

"Yours truly,        .        EAU CLAIRE CANNING CO.,
Per R. W. REESE, *Sec'y.*"

On July 11, 1901, Knight & Co. wrote plaintiff in error that they had a buyer for 1000 cases of future tomatoes, who would pay seventy-five cents f. o. b. factory, "less your Chicago rate of freight, which we understand to be nine cents;" and closed their letter as follows: "Please let us know by return mail if you wish to take this order." On July 15, 1901, the plaintiff in error wrote to W. S. Knight & Co. saying: "Our tomato crop will be a failure. The extended drouth following the extreme cold weather of a late spring has destroyed almost the entire prospect, and I am sorry to inform you we are in no condition to make any proposition at all." On July 21, 1901, plaintiff in error, by its secretary, R. W. Reese, wrote to W. S. Knight & Co. saying: "The continued drouth leads me to believe we shall have no pack on tomatoes at all in this section. The extreme heat in connection with the parched condition of the earth is killing off most of our vegetation. We shall have a good pack on peaches. Trusting we may yet do some business with you," etc.

According to Eagle's testimony, Reese called at the office of Knight & Co. in Chicago several times in July and August, 1901, and said that the prospects were bad for the tomato crop, and that he did not know what they were going to be able to do. Eagle says: "I suggested to him that he ought to go to the Western Brokerage Company; they were here in town and right handy, and he promised to do it. * * * Later on he said he didn't think he was going to get any, and couldn't fill the contract of the Western Brokerage Company, and I advised him to go and see them and make a settlement with them. He promised to do so." Reese, in his testimony, does not deny that he had a talk with Eagle. On September 23, 1901, defendant in error, the Western Brokerage Company, wrote Knight & Co. as follows: "Please refer to our contract made through you with the Eau Claire Packing Company for 5000 cases three pound standard tomatoes. Please advise us when these tomatoes will be ready for shipment, so we can give you proper shipping instruc-

tions." On September 24, 1901, W. S. Knight & Co. wrote a letter to the plaintiff in error, enclosing the above letter of September 23, 1901, and saying: "Please let us know promptly what to say to these people in the matter. When your Mr. Reese was here last, he talked about selling some peaches, promised to send us samples. We learn that he had samples in the hands of one of our competitors, Fisk-Kyle Co. We were under the impression that we represented your company exclusively in this market, and would be pleased to know if we are in error in thinking so."

The letter of September 24, 1901, with its enclosure, was received by the plaintiff in error, but no reply was made to either of the said letters. Thereupon, on October 16, 1901, Dudley Smith went to Eau Claire for the purpose of giving shipping directions with reference to the tomatoes, called upon Reese, and gave him such directions; and thereupon Reese informed Smith that the canning company had no contract with defendant in error, the Western Brokerage Company, for the delivery of tomatoes, and had not accepted any order from the said Knight & Co. for the account of said Western Brokerage Company, and thereupon refused to carry out the contract, which the said Western Brokerage Company claimed to have been made with Knight & Co., as agent of the Eau Claire Canning Company.

On returning from Eau Claire, Smith wrote Knight & Co. the following:

"CHICAGO, Oct. 17, 1901.
"Messrs. W. S. Knight & Co., Chicago:
"GENTLEMEN—We have your contract under date of June 24, reading as follows: 'Sold to the Western Brokerage Company, for account of Eau Claire Packing Company, Eau Claire, Mich., 5000 cases standard three pound tomatoes at seventy-five cents per dozen f. o. b. factory, less fifteen cents per cwt. freight allowance, cash, less one and one-half per cent, pack of 1901, to be shipped when packed.' In taking this up with these packers to give them shipping instructions, they advised us that you have made no contract with them, and they have not accepted an order from you for that account. This, of course, is a great surprise to us, as these tomatoes were purchased by us in good faith, and we have given sales ticket, confirming the purchase to the Western Grocer Company, Kansas City,

Mo., and we must request that you take this up at once with the packers, and have shipment made of these 5000 cases tomatoes covered by your contract. Please have them shipped by the Big Four railroad via Peoria, c/o Iowa Central, c/o Chicago Great Western at Marshalltown. Trusting you will give this your immediate attention and have these tomatoes shipped at once," etc.

Upon receipt of this letter Eagle went to Eau Claire to ascertain upon what facts plaintiff in error based its action in advising Mr. Smith that no contract existed for the sale of the tomatoes in question. Eagle saw Reese at Eau Claire, and Reese says: "Eagle asked me why, or when I was going to ship the tomatoes we had sold to the Western Brokerage Company, and I said we hadn't sold any tomatoes to the Western Brokerage Company, that we had no contract for any such sale. That was the last talk I had with Mr. Eagle."

It was stipulated that the Western Brokerage Company was at all times ready, able and willing to receive the tomatoes, and to pay for the same in accordance with the terms set forth in the ticket hereinbefore referred to.

It was stipulated between the parties that no tomatoes were delivered in pursuance of said negotiations, and that, if the defendant in error was entitled to recover, its damages should be assessed at $3500.00.

Scott, Bancroft, Lord & Stephens, for plaintiff in error.

Calhoun, Lyford & Sheean, for defendant in error.

Mr. Justice Magruder delivered the opinion of the court:

*First*—At the December term, 1904, of this court, the defendant in error, the Western Brokerage Company, made a motion to dismiss the writ of error herein, which motion was reserved to the hearing, and will now be considered.

The ground, upon which it is sought to dismiss the writ of error, as the same is stated in the motion, is as follows: "For the reason that it appears from the record herein that at

and prior to the time of the suing out of said writ of error, the plaintiff in error was civilly dead and absolutely extinct, and for that reason incapable of suing out said writ of error."

The present plaintiff in error prosecuted its appeal herein from the judgment of affirmance entered by the Appellate Court, but the present defendant in error made a motion in this court to dismiss the appeal upon the grounds, first, that the appeal bond was not filed within the time allowed by the Appellate Court, and second, because the proceeding was an attempt by certain receivers in voluntary dissolution to conduct an appeal in the name of a dissolved and extinct corporation. This court dismissed the appeal upon the first ground above stated, but passed no opinion upon the second reason above assigned for the dismissal of the appeal. Thereafter the present plaintiff in error, then the appellant in the Appellate Court, withdrew the record, and sued out this writ of error in the name of the "Eau Claire Canning Company, plaintiff in error."

After the judgment of the Superior Court of Cook county was rendered in this case on July 24, 1903, proceedings were brought, under the statutes of Michigan providing for the voluntary dissolution of corporations, in the circuit court of Berrien county, Michigan, for the voluntary dissolution of plaintiff in error, Eau Claire Canning Company, the defendant in the trial court, and three persons, named Sharp, Lovell and Whalen were appointed receivers by decree entered by said circuit court on May 21, 1904. By the latter decree it was provided "that said corporation (Eau Claire Canning Company), shall be and is hereby dissolved." The statutes of Michigan here referred to are set forth in full in the record of the Appellate Court, and a certified copy of said decree of dissolution and of said statutes are attached to the bond presented by the plaintiff in error on its application for a *supersedeas.* The defendant in error herein contends that, by virtue of the decree of the Michigan circuit court, and the statute, under which the same was rendered, the corporation,

known as the Eau Claire Canning Company, was pronounced civilly dead, and that its corporate existence thereby ceased, so that it became absolutely extinct, and the power to collect its assets, pay its debts, and wind up its affairs, including the power to sue and be sued, became vested in its legal successors or trustees or receivers, and that as a consequence a suit could not be maintained in its name in the courts of Illinois.

In this State the suing out of a writ of error is the beginning of a new suit. (*Ripley* v. *Morris,* 2 Gilm. 381; *International Bank* v. *Jenkins,* 107 Ill. 291; *Singer & Talcott Stone Co.* v. *Hutchinson,* 176 id. 48.) Therefore, the suing out of the present writ of error is the beginning of a new suit in this court by the plaintiff in error, the Eau Claire Canning Company, a Michigan corporation, and not by Sharp, Lovell and Whalen, the receivers of plaintiff in error, as appointed by the Michigan circuit court. The question is, whether this suit is properly begun, or this writ of error is properly sued out, in the name of the corporation itself.

It is true that, by the terms of section 8 of the Michigan act in regard to the voluntary dissolution of corporations, "a decree shall be entered dissolving such corporation and appointing one or more receivers of its estate and effects; and such corporation shall thereupon be dissolved and shall cease." But section 36 of that act provides as follows: "Whenever a receiver of the property and effects of a corporation has been appointed, before its dissolution or afterwards, new suits may be brought and carried on by any such receivers either in their own names, or in the name of the corporation for which they shall have been appointed." It is also shown by the record herein that section 8 of chapter 230 of the compiled laws of Michigan, a copy of which is attached to the *supersedeas* bond, provides "that all corporations, whose charters shall expire by their own limitation or shall be annulled by forfeiture or otherwise, shall, nevertheless, continue to be bodies corporate for the term of three years after the time when they would have been so dissolved,

for the purpose of prosecuting or defending suits by or against them.  \* \* \*  But not for the purpose of continuing the business for which such corporations have been or may be established." In addition to the statutes above quoted, it also appears from the record herein that, on the 28th day of October, 1904, the circuit court of Berrien county, Michigan, entered an order, authorizing the receivers to sue out a writ of error in this court to review the judgments of the Superior Court and of the Appellate Court of Illinois for the First District, in the case now sought to be reviewed, and authorized such receivers to sue out such writ in the name of such corporation. Pursuant to the authority conferred by the statutes of Michigan, as above quoted, and by the order so entered on October 28, 1904, the receivers have sued out the present writ of error in the name of the corporation. We are of the opinion that the suing out of the writ of error herein in the manner thus stated was proper, and that the receivers of plaintiff in error had the right so to proceed in the name of the corporation.

The plaintiff in error, the Eau Claire Canning Company, did not, by the decree of dissolution so entered by the Michigan circuit court, cease to be a corporation for all purposes, but merely ceased to be such for the purpose of continuing its corporate business. It still continued to exist for the purpose of collecting its assets, and winding up its business under the control of the receivers as aforesaid in place of the officers elected by the stockholders. By section 36 of the Michigan statute, as above quoted, new suits were authorized to be brought and carried on by the receivers in the name of the corporation; and by the order of October 28, 1904, the receivers were expressly authorized by the Michigan court to sue out the present writ of error from this court in the name of the corporation itself. The course of proceeding thus authorized by the Michigan statute and the Michigan court is in harmony with the statutes of Illinois, and with the decisions of this court.

In *Ramsey* v. *Peoria Marine and Fire Ins. Co.* 55 Ill. 311, the action was brought by a dissolved corporation, and the objection was made that the corporation had ceased to exist by reason of its dissolution by decree of the circuit court of Peoria county, but this court there held that, under the statute of this State extending the time for closing up the affairs of corporations where a corporation has been dissolved by a decree of court and a receiver has been appointed, a suit may be instituted·and judgment recovered by the receiver in the name of the corporation after such dissolution upon debts due to the corporation; and that for such purpose the corporate capacity of the corporation is by the law continued for a period of two years after such dissolution.

In *Life Association of America* v. *Fassett,* 102 Ill. 315, an action of attachment had been brought against the Life Association, a Missouri corporation; pending the action and prior to the final judgment, defendant was dissolved by the St. Louis courts, and a receiver was appointed to wind up its affairs; and although the decree of the St. Louis court in terms declared the corporation dissolved, suits were authorized to be brought and defended in the name of the corporation for the purpose of winding up its business and paying its debts, etc., by other portions of the decree. In that case, the receiver appointed by the St. Louis court entered a special appearance in the Illinois suit for the purpose of filing written suggestions of the dissolution of the company under the proceedings in Missouri, and the court entered an order striking the suggestions from the files; thereafter the case was taken to this court by writ of error to ·the Appellate Court where the ruling of the trial court had been affirmed, and this court held that the corporation still existed for the purpose of collecting its debts and winding up its affairs, and affirmed the judgment of the Appellate Court. In the *Fassett case,* after referring to the statute of this State which contains a provision extending the existence of dissolved corporations for two years from the date of their dissolution

for the purpose of making a just and equitable distribution of their assets, we said (p. 324) : "From these and other provisions of the statute it clearly appears that it is a part of the settled policy of the State, at least so far as domestic corporations are concerned, that upon their dissolution, however that may be effected, they shall nevertheless be regarded as still existing for the purpose of settling up their affairs and having their property applied for the payment of their just debts, and we see no sufficient reasons why the same policy should not, so far as practicable, be extended to foreign corporations that have property here, and are located among us for business purposes. * * * In addition to the reasons already given why we hold the company to be still existing for the purposes of enforcing the claim of defendant in error, it may be further stated, that, although the decree of the St. Louis circuit court, in terms, declares the corporation dissolved, yet by other portions of the decree, for the purpose of winding up the business of the company, paying its debts, etc., suits are authorized to be brought and defended in the name of the corporation, and it is also authorized for the same purpose, to make, in its corporate name, all necessary conveyances of its property and effects. It is thus clear, when all the provisions of the decree are considered together, as they should be, the corporation is not absolutely extinguished for all purposes, but, on the contrary, is expressly kept alive, so far as its existence may be necessary, to collect and apply its assets to the payment of its debts."

In *St. Louis and Sandoval Coal and Mining Co.* v. *Coal Mining Co.* 111 Ill. 32, one of the defenses pleaded was that the plaintiff corporation before the bringing of suit had been dissolved by decree of court, and it is there said (p. 39) : "After a valid decree appointing a receiver for a private corporation, actions may be brought in its name, by leave of the court, against any one except the receiver, to try the legal title to property. It remains in being for the settling up of

213—37

its affairs and having its property applied in the payment of its debts. * * * The statute relating to private corporations continues their corporate existence for two years after their powers have expired, by limitation or otherwise, for the purpose of collecting their debts and disposing of their property." (See also *Stetson* v. *City Bank of New Orleans,* 2 Ohio St. 167; *Michigan State Bank* v. *Gardner,* 81 Mass. 362; *State* v. *Bank of Washington,* 18 Ark. 554; *Anglo-American Land Mortgage and Agency Co.* v. *Cheshire Provident Institution,* 124 Fed. Rep. 464; *Singer & Talcott Stone Co.* v. *Hutchinson, supra; Franklin Bank* v. *Cooper,* 36 Me. 179).

It is said, however, by counsel for the defendant in error that the statutes of Michigan, as above quoted, and the order of the Michigan court entered on October 28, 1904, can have no extra-territorial effect, nor any control of the method of procedure in the Supreme Court of Illinois. In support of this contention, certain language, used *in arguendo* in the case of *Life Association of America* v. *Fassett, supra,* is quoted. The present case, however, differs from the *Fassett case,* in that here there was not merely the decree or order of a court in a foreign State authorizing this suit to be begun, but there was an express provision of the statute of Michigan authorizing new suits to be brought and carried on by the receivers of a dissolved corporation in their own names or in the name of the corporation. This statute of Michigan is in harmony with the policy, which prevails in our own State in regard to the continuance in existence of dissolved corporations for the purpose of instituting such proceedings as are necessary to the winding up of their business. While comity between different States does not require a law of one State to be executed in another when it would be against the public policy of the latter State, it is nevertheless true that one State or nation will recognize and execute the laws of another through comity, when such execution is not against the public policy of the former State. (*Pope* v. *Hanke,* 155

Ill. 617). As has already been shown, there is nothing in the statutes of Michigan, as here quoted, which is against the public policy of Illinois. For the reasons above stated we are of the opinion that the motion to dismiss the writ of error should not be allowed, and, accordingly, the same is denied.

*Second*—As to the merits of the case at bar, it appears that the trial below was had before the court by agreement without a jury; that the defendant in error submitted no propositions to be held as law in the case, but that the plaintiff in error submitted nineteen propositions. Of the latter the court held eleven as law, to-wit: those numbered, 2, 3, 5, 6, 7, 9, 10, 14, 15, 16 and 18, but refused to hold as law eight of said propositions, numbered 1, 4, 8, 11, 12, 13, 17 and 19.

The complaint of the plaintiff in error is, that the trial court refused to hold as law the propositions, asked by the plaintiff in error, to the effect that the defendant in error could not recover upon the evidence in the case; and that the trial court refused to hold, as a proposition of law, that the "bought" and "sold" notes, delivered by W. S. Knight & Co. to defendant in error and to plaintiff in error, did not constitute a contract; and that the trial court admitted and considered certain testimony of the witnesses of the defendant in error, to the effect that sales upon the Chicago market were usually made upon "regular terms;" and that the trial court held that there was a sale here upon "regular terms," and with a guaranty of quality; and that plaintiff in error was bound by the note or memorandum sent to it by W. S. Knight & Co.

Leaving out of view for the present the papers or memoranda, denominated by plaintiff in error as the "bought" and "sold" notes, we think it apparent from the correspondence, set out in the statement of the facts preceding this opinion, and from the oral testimony introduced in connection with the correspondence, that W. S. Knight & Co. were the agents of plaintiff in error to sell its tomatoes for it upon the Chi-

cago market, and, as such agents, consummated a sale of the same to the defendant in error. The judgment of the trial court in favor of defendant in error, and the judgment of the Appellate Court affirming the same, are conclusive upon this court as to all questions of fact decided by the trial court; and we can only consider such evidence, so far as it is necessary to ascertain whether or not it tends to sustain the cause of action. Eagle, the president and representative of the agents or brokers, W. S. Knight & Co., swears that, in the spring of 1901, and before the 24th day of May, 1901, Reese, the secretary of plaintiff in error, called upon him, and requested that his firm, W. S. Knight & Co., should sell the goods of plaintiff in error for the latter, and that he, Eagle, agreed to do so. This testimony is confirmed by the language of the letters, which subsequently passed between the parties. In the letter of May 24, 1901, written by Reese, the secretary of plaintiff in error, to W. S. Knight & Co., reference is made to the call, theretofore made by Reese on W. S. Knight & Co. regarding "the canned goods arrangement, sales, etc." On May 25, 1901, Eagle, for W. S. Knight & Co., wrote a letter, referring to seventy-five cents per dozen as the price of tomatoes, and making use of the expression "regular terms." On June 13, 1901, Eagle for W. S. Knight & Co., again wrote plaintiff in error, proposing to sell its tomatoes "for future delivery if you will make price seventy-two and one-half cents regular terms delivered here, guaranteeing the quality strictly standard, goods to be shipped when packed." Without further reference to the language of the letters, it clearly appears that the only difference between Reese, representing plaintiff in error, and Eagle, representing W. S. Knight & Co., was as to the price of the tomatoes, Eagle suggesting that they could only be sold at the price of seventy-two and one-half cents per dozen, and Reese insisting that the plaintiff in error would not sell at less than seventy-five cents per dozen; but in none of the letters does Reese object to the terms of sale, suggested by Eagle, other

than the amount, or number of cents per dozen. No objection is made in any of the letters to a sale of the tomatoes upon "regular terms," nor is any objection made by Eagle, or the plaintiff in error, to a guaranty of the quality as being strictly standard. The whole correspondence shows that the sale was finally made at the price of seventy-five cents per dozen for the tomatoes, and upon "regular terms," and with a guaranty of the quality as standard.

In the letter of June 19, 1901, to W. S. Knight & Co., plaintiff in error stated that they had been offered seventy-five cents on 5000 cases of three pound tomatoes delivered and would make a concession in regard to freight. On June 20, 1901, Knight & Co. wrote to Reese, or plaintiff in error, saying: "We now have a proposition from an Iowa jobber who offers seventy-five cents less fifteen cents per hundred freight for 5000 cases. * * * Please let us know promptly whether or not you will accept this offer." On June 21, 1901, the plaintiff in error, through its secretary, Reese, wrote to Knight & Co. as follows in reply to the letter of June 20, 1901, to-wit: "Referring to yours of the 20th inst. Will state that if you can secure order for 5000 cases three pound tomatoes at seventy-five cents, we will allow fifteen cents per cwt. freight." Upon the receipt of this letter, Eagle, representing Knight & Co., closed a bargain with the defendant in error for the sale of the tomatoes upon the terms named in the letter of plaintiff in error written on June 21, 1901. It is true that, in the letter of June 21, 1901, plaintiff in error did not refer to a sale on "regular terms," nor to a guaranty of the quality as strictly standard, but the correspondence theretofore showed that the parties understood that the sale was to be made upon regular terms and with a guaranty of the quality as standard, provided the price should be seventy-five cents per dozen, instead of seventy-two and one-half cents per dozen. Independently, therefore, of any question as to a contract, formed by the exchange of "bought" and "sold" notes, W. S. Knight & Co., as authorized agents of

the plaintiff in error, made a sale of 5000 cases of canned to-matoes to defendant in error. What was subsequently done in reference to the exchange of "bought" and "sold" notes, or written memoranda, was merely for the purpose of carrying out and consummating a sale, which the authorized agents of plaintiff in error had made for it. The second count of the declaration alleged that such sale was made through W. S. Knight & Co., as the authorized agents and brokers of the plaintiff in error.

*Third*—If it be assumed that the contract between the parties must be based exclusively upon the "bought" and "sold" notes, alleged to have been exchanged, yet it cannot be said that such "bought" and "sold" notes did not constitute a valid contract between plaintiff in error and defendant in error. The contention of the plaintiff in error is that the bought and sold notes, delivered by W. S. Knight & Co. to the defendant in error and by the latter to plaintiff in error's agents, show that there was no meeting of the minds of the parties, and for that reason do not establish a contract. The plaintiff in error claims that W. S. Knight & Co., the brokers, were the agents of both the plaintiff in error and defendant in error for the purpose of executing bought and sold notes. The weight of authority is in favor of the position that, where such a broker, representing both parties, enters no memorandum of the sale in his book, or such book is not produced, the bought and sold notes together, if they agree, establish the contract between the parties, but, if they differ materially, they fail to establish a contract. (4 Am. & Eng. Ency. of Law,—2d ed.—pp. 753, 754). Where, however, the difference between the bought and sold notes is immaterial, it will not amount to such a variance as will defeat the contract. (Ibid.) But "a material variance may be explained by a usage of trade." (Ibid.)

"Bought" and "sold" notes have been defined to be "written memoranda of a sale of goods, delivered to the parties thereto by the broker employed to negotiate the sale."

(4 Am. & Eng. Ency. of Law,—2d ed.—p. 751). Generally, the memorandum delivered to the buyer is the bought note, and that delivered to the seller is the sold note, but some authorities hold that the sold note is delivered to the buyer and the bought note to the seller. (Ibid.; Story on Agency, sec. 28). The latter view was taken by this court in *Saladin* v. *Mitchell*, 45 Ill. 79, where the court, after defining a broker as "an agent employed to make bargains and contracts between other persons in matters of trade, for a compensation commonly called brokerage," and as a mere negotiator between other parties, who never acts in his own name, but in the names of those who employ him, and, when he is employed to buy or sell goods, is not entrusted with the custody or possession of them, and is not authorized to buy or sell them in his own name, used the following language (p. 83) : "He is a middle man, and, for some purposes, is treated as the agent of both parties. Where he is employed to buy and sell goods, it is the custom to give to the buyer a note of the sale, called a 'sold note,' and to the seller a like note, called a 'bought note,' in his own name, as agent of each, whereby they are respectively bound, if he has not exceeded his authority." In *Saladin* v. *Mitchell, supra,* the bought note was signed by Saladin, the purchaser, and not by a broker or agent, and it certified that he, Saladin, had bought of Mr. Hall 5000 bushels of barley as per sample, etc. The sold note, however, was signed by Hall, the broker, who was authorized to sell the barley for the owner thereof and certified that there had been "sold to Saladin, 5000 bushels Canada barley." In the case at bar, the sold note, or sale ticket, which was given by Eagle of the firm of W. S. Knight & Co., as the representative of plaintiff in error, to Smith, the representative of the defendant in error, was signed by W. S. Knight & Co., the brokers, but the memorandum, or bought note, which was delivered by Smith for defendant in error to Eagle, the agent of plaintiff in error, was signed by the Western Brokerage Company itself through Dudley Smith.

The present case is thus similar to the case of *Saladin* v. *Mitchell, supra,* in that one of the notes or tickets, exchanged between the parties, was signed by one of the parties, and not by any agent, while the other note was signed by the agents of plaintiff in error, the seller of the tomatoes. The sale ticket, enclosed by W. S. Knight & Co. to the plaintiff in error in their letter of June 24, 1901, was merely an unsigned memorandum, in which W. S. Knight & Co. stated, or attempted to state, the terms of the sale theretofore made by them to the defendant in error. The memorandum, so enclosed by Knight & Co. in their letter of June 24, 1901, was not one of the bought and sold notes, or sale tickets, exchanged between the parties, but was merely a statement by Knight & Co., giving their own interpretation of what the contract was. The contract had already been made and completed by the exchange of the two documents, dated June 24, 1901, one of which was signed by "W. S. Knight & Co.," and the other of which was signed by "Western Brokerage Co., per Dudley Smith."

It is claimed on behalf of plaintiff in error that the sale ticket given by Eagle to Smith, dated June 24, 1901, and signed by W. S. Knight & Co., as set forth in the statement preceding this opinion, differs materially from the memorandum of the same date, delivered by Smith to Eagle, and signed by "Western Brokerage Co., per Dudley Smith." There is said to be a material variance between these two instruments, which are called the bought and sold notes. Something is also said to the effect that there is also a variance between each of these instruments and the unsigned memorandum, sent by W. S. Knight & Co. to the plaintiff in error in the letter written by W. S. Knight & Co. to the plaintiff in error on June 24, 1901. As the latter memorandum was a mere unsigned report, made by W. S. Knight & Co., it cannot be regarded as one of the sale tickets actually exchanged between the parties, and, therefore, if a material variance existed to such an extent that the minds of the par-

ties did not meet, it must be a variance between the instrument, dated June 24, 1901, signed by W. S. Knight & Co. and the instrument of the same date, signed by the Western Brokerage Company, per Dudley Smith.

The variance between the instrument, signed by W. S. Knight & Co., which we will call the sale ticket, and the instrument signed by Western Brokerage Company, per Dudley Smith, which we will call the bought ticket, is said to consist in this, that the sale ticket contained no guaranty of swells or quality, while the bought ticket contained the "usual guarantee against swells and quality." The latter also contained the words, "terms regular," which the former did not contain. Both of them, as we understand them, contained the words, "5000 cases of standard No. 3 tomatoes," or "three pound tomatoes." The rule that, where there is a variance between the bought and sold notes, no contract is established, refers to a variance which is material. In view of the evidence in this case it cannot be said that there is any material variance between the ticket, signed by W. S. Knight & Co. and that signed by Western Brokerage Company.

*Fourth*—Where a person deals in a particular market, he must be taken to deal according to the known general and uniform customs or usages of that market. Where a principal employs an agent to act for him in a particular market, he must be taken as intending that the business to be done will be done according to the usage and custom of that market whether the principal ever knew of the usage or custom or not. (*Bailey v. Bensley,* 87 Ill. 556). The correspondence, however, shows that plaintiff in error intended to sell upon the Chicago market under its custom, and, as is well said by the Appellate Court: "The evidence fully warranted the trial judge in holding that Reese, the secretary and business manager of the appellant, knew of that custom prior to June 20, 1901, and assented to the same." In *Lonergan v. Stewart,* 55 Ill. 44, we said: "Although it is true, usages of trade cannot be set up either to contravene an established

rule of law, or to vary the terms of an express contract, yet all contracts made in the ordinary course of business, without particular stipulations, expressed or implied, are presumed to be made in reference to any existing usage or custom relating to such trade, and it is always competent for a party to resort to such usage to ascertain and fix the terms of the contract." (See also *Burton* v. *Goodspeed,* 69 Ill. *237; Payne* v. *Potter,* 9 Iowa, 552).

The testimony in this case shows that the words, "regular terms," have a definite meaning, which is that the buyer has a credit of sixty days with the privilege of a one and one-half per cent discount in case cash is paid within ten days from date of invoice, and also that there is a six months' guaranty on swells. Swells refer to defective cans, in which the tomatoes may be packed. The defect sometimes is in the can itself, and sometimes in the manner in which the tomatoes are packed. The words, "usual guarantee against swells and quality," as used in the memorandum signed by Western Brokerage Company, although not written in so many words in the sale ticket signed by W. S. Knight & Co., are yet a part of the latter ticket by implication, in view of the usages and customs of the market, in which the parties were transacting their business. Reese, the secretary of plaintiff in error, says in his evidence: "I do not presume I sold on any other than 'regular terms' in the Chicago market. I think all of the pack of our factory for the year 1901 was sold upon the terms of sixty days from the date of invoice, with one and one-half per cent discount in case of cash in ten days." The words "cash, less one and one-half per cent," have no other or different meaning than the words, "terms regular, less one and one-half per cent, cash ten days," as used in the memorandum signed by Western Brokerage Company. The phrase, "cash, less one and one-half per cent," is elliptical, and requires expansion to fully express the meaning intended. "In the language of the commercial world, sales where it is intended that the purchaser is to have

a short credit, as, for example, ten days, or even thirty days, are often termed cash sales, while the strict legal signification of a cash sale is undoubtedly one where delivery and payment are to be concurrent acts and be performed at the same instant of time.'" (*Anglo-American Provision Co.* v. *Prentiss,* 157 Ill. 506). The evidence tends to show that the usage of the Chicago market was invariably to guarantee quality, and against swells. The ticket signed by W. S. Knight & Co. provided for the sale of 5000 cases of standard No. 3 tomatoes, that is to say, tomatoes of standard quality. The witness, Tilghman, says: "When we guarantee quality, we mean a can full of tomatoes in the first place; in the second place, they shall be ripe fruit; that is a standard can; that is a recognized standard can in all markets of the country." Therefore, when the ticket signed by Western Brokerage Company provided for the usual guaranty of quality, it did nothing more than provide for the standard quality, expressed by the word "standard" as used in the ticket signed by W. S. Knight & Co. The usages of trade, taken in connection with the reference in the correspondence to "regular terms" and the guaranty of quality, authorized Knight & Co. to make the usual and customary guarantees, which accompanied sales in the Chicago market. The witness, Nichols, says: "When I speak of guaranteeing swells for the season, I mean for the season following delivery of goods; that would be six months from the date of·shipment or date of invoice." Some of the testimony tends to show that a season's guaranty is for twelve months, while other portions of the testimony tend to show that such guaranty is for six months only. As, according to the usages and customs of the Chicago market, as proven in the testimony, all sales were made upon "regular terms," and with the usual guaranty against swells, and upon sixty days' credit, or one and one-half per cent discount in case of cash in ten days, the law imports these words into the ticket, signed by W. S. Knight & Co., and, therefore, it cannot be said that there is

any material variance between the two tickets or notes. As is well said by the trial court: "In this view of the case, it cannot be said there is any material difference between the sales ticket and the memorandum sent the defendant, because season's guaranty on swells on memorandum, and not on the sale ticket, is embraced according to usage in 'regular terms,' upon which the sale was made, as per letter of June 13, 1901, and the reply of defendant to it. The law read the words upon the sale ticket. They were not there in words, but implied."

*Fifth*—In addition to what has been said, the two tickets, or bought and sold notes, the one signed by W. S. Knight & Co. and the other signed by Western Brokerage Company, were both executed at the same time, and as parts of the same transaction. "They are to be treated precisely as though both had been actually embodied in the same document, and in construing them, force is to be given, if possible, to the language of both." (*Anglo-American Provision Co.* v. *Prentiss, supra*). In *Gardt* v. *Brown,* 113 Ill. 475, it is held: "Where two written instruments are executed as the evidence of one transaction, they will be read and construed together as one instrument, in arriving at the intention of the parties." In *Wilson* v. *Roots,* 119 Ill. 379, it is held: "Where different instruments are executed as the evidence of one transaction or agreement, they are to be read and construed as constituting but a single instrument. Although it is not competent to contradict or enlarge the terms of a written agreement by parol evidence, it is competent to resort to such evidence to ascertain the nature and qualities of the subject to which the instrument refers. Courts, in construing written contracts, endeavor in all cases to place themselves in the position of the contracting parties, so that they may understand the language, and in the sense intended by the persons using it." (See also *Keith* v. *Miller,* 174 Ill. 64).

The two memoranda here under consideration do not contradict each other. The provisions contained in one are

not repugnant to any of the provisions contained in the other. If they be construed together with like force and effect as if embodied in the same document, each contains all the material provisions appearing in the other, and together they establish the agreement made between Smith and Eagle. The report of sale, communicated by Knight & Co. to the canning company in the letter of June 24, 1901, is merely a synopsis of the contract actually effected, and contains all the material provisions appearing in either of the two memoranda. The terms and conditions embodied therein correctly summarize the terms and conditions actually agreed upon between the parties, as evidenced by the respective memoranda exchanged between them.

In *Saladin* v. *Mitchell, supra,* the court had no difficulty in deciding that the bought and sold notes, involved in that case, constituted a contract between the parties, and yet there was a greater variance between the two notes in that case than between the notes in the case at bar. The bought note, signed by Saladin, stated that he had bought of Mr. Hall 5000 bushels of barley, while the sold note signed by Hall, the agent, stated that there had been sold to Saladin 5000 bushels of *Canada* barley. The one note also spoke of the purchase of 5000 bushels of barley as "per sample," while the note signed by Hall spoke of a sale to Saladin of 5000 bushels of *Canada barley* without the use of the words, "as per sample." The one note also referred to storage at two or two and one-half cents, while the other referred to storage at two cents only. Again in *Murray* v. *Doud & Co.* 167 Ill. 368, the bought note provided for "goods to be *in prime condition* on arrival in Chicago," while the sold note provided for "goods to be *in prime condition for butterine purposes* on arrival in Chicago." Here was a variance between the two notes, inasmuch as the latter used the words "for butterine purposes," while the other omitted these words, and yet this court says, referring to the testimony of the broker, L. M. Prentiss (p. 372): "It further appears

from his testimony that upon making the sale the 'bought and sold notes' were made out and delivered to the respective parties. The law is well settled that 'bought and sold notes' executed by a broker, like those in question, are competent evidence to establish a contract. Here, Prentiss was a broker. He was empowered to sell the leaf lard that plaintiffs should produce during a specified period. He made the sale as he was authorized to do, and executed the 'bought and sold notes' as evidence of the transaction. Notes of this character have been fully sustained by this and other courts."

*Sixth*—Again, the conduct of plaintiff in error amounts to a ratification of the contract, evidenced by the "bought and sold notes" exchanged between defendant in error and W. S. Knight & Co., the agents of plaintiff in error. On June 24, 1901, Knight & Co. sent by mail to the plaintiff in error the unsigned sale ticket or memorandum already referred to, which summarized and gave a synopsis of the terms and conditions of the contract previously entered into. This sale ticket was retained by the plaintiff in error for about four months without any repudiation of the contract therein described. "Ratification is equivalent to previous authority. It operates upon the act ratified in the same manner as though the authority had been originally given." "Ratification relates back to the beginning of the thing ratified and renders it obligatory from the outset." (23 Am. & Eng. Ency. of Law,—2d ed.—p. 890, and cases in notes). In the case at bar, the ratification by the plaintiff in error of the ticket, forwarded by W. S. Knight & Co., is equivalent to specific authority previously given to effect a sale, with the guaranty concerning swells, set forth on said ticket as aforesaid. Where a principal, upon being informed of an unauthorized act of another in his behalf, does not give notice of his non-concurrence within a reasonable time, he is held to assume the responsibility for the act thus reported. Inasmuch as the plaintiff in error received a report of sale from W. S. Knight & Co. on June 24, 1901, and failed to repudiate their

act therein described, it will be held in law to have ratified and approved each and all of the terms of sale described in such report. It was the duty of the plaintiff in error to notify Knight & Co., or the defendant in error, within a reasonable time, of its refusal to be bound by the sale as reported, if it did not intend to accept the same; but it gave no such notification. In *Barbour* v. *Mortgage Co.* 102 Ill. 121, this court said (p. 128) : "He, (the appellant,) had no right to lie by in silence, and wait until third parties had advanced large amounts of money upon the faith of what his agent had done, and then undertake to repudiate the act as unauthorized. Honesty and fair dealing required Barbour to act at once upon receiving information of the unauthorized act of his agent." The silence of the plaintiff in error, under the circumstances, was an acquiescence in, and a ratification of, the acts of Knight & Co., its agents. "In all the varied business transactions of men, wherever the relation of principal and agent exists, it is the duty of the principal to repudiate the unauthorized act of his agent as soon as he reasonably can after it has come to his knowledge, or he will be held to have ratified it." (*McGeoch* v. *Hooker*, 11 Ill. App. 649).

Here, plaintiff in error not only did not repudiate the contract, or give any intimation that it did not approve of the act of its agents in making it, but it impliedly endorsed the contract by some of the language used in the letters written by it. For example, in the letter written by plaintiff in error to W. S. Knight & Co. on June 26, 1901, refusing an offer of said firm to sell 5000 cases of tomatoes in addition to those sold to the defendant in error, plaintiff in error said : "We will not be able to secure more than one-half that amount, and we do not feel like contracting any *farther futures* less than seventy-five cents straight." By the use of the words, "farther futures," the plaintiff in error evidently referred to its inability to make any farther or other sales than the sale already made to defendant in error, thereby recognizing the latter sale as having been made.

As to the amount of the judgment in this case, no objection is made by the plaintiff in error. It is conceded by both parties that, if the defendant in error is entitled to recover at all, the amount of the judgment rendered by the trial court is correct.

For the reasons above stated, we are of the opinion that the contract of sale, as set forth in the declaration, was actually made, and that the finding of the trial court, and the judgment entered upon that finding, are correct.

Accordingly, the judgment of the Appellate Court is affirmed.        *Judgment affirmed.*