## THE ANGLO-AMERICAN PROVISION COMPANY

### *v.*

### LEWIS M. PRENTISS.

*Filed at Ottawa October 11, 1895.*

1. SALES—*proposition to sell must be accepted as made.* The assent of one to whom a proposition to sell goods is made, to be valid and form a contract, must meet and correspond with the offer, neither falling short of nor going beyond the terms proposed.

2. SAME—*effect of acceptance with modification.* Acceptance of a proposition to sell goods with a modification of terms constitutes, in law, a rejection of the proposition and the substitution in its place of a new proposition, which, to constitute a contract, must be itself accepted by the other party.

3. SAME—*how acceptance of offer may be made.* The acceptance of a written proposition to sell goods need not be in writing, but may be made orally, or may be inferred from the conduct of the other party.

4. SAME—*acceptance of offer to sell for cash by offer to pay bills daily.* An acceptance of a written offer to sell merchandise stipulating "terms of sale cash," which acceptance states that the buyer "will pay bills daily," is not, in view of the latitude allowed to terms requiring cash payment, such a variance of the proposition as will amount to a rejection thereof, but will make a binding contract.

5. SAME—*when part performance will amount to acceptance of proposition.* Even if, in such case, the acceptance with agreement to "pay bills daily" were a rejection of the original proposition to sell for cash, delivery by the seller of more than half the quantity of goods purchased would amount to an acceptance of the buyer's new offer, with the variation of terms of payment.

6. SAME—*no default till seller of goods renders bills.* Before a purchaser of merchandise, under a contract whereby bills for goods delivered are to be payable daily, can be placed in default, the seller must render bills of the goods delivered.

7. SAME—*purchaser agreeing to "pay bills daily" has whole day in which to pay.* A purchaser who agrees to pay bills daily for goods delivered has the whole of the day upon which the bills are presented to make payment; and the contract cannot be rescinded in the afternoon of any day for failure to pay bills presented that day.

8. SAME—*effect of arrangement for buyer's customers to pay daily bills.* An arrangement by which merchandise purchased is to be delivered to the buyer's customers and collection made from them is not a departure from the terms of the contract requiring the purchasers to pay bills daily, but merely a means for executing it.

9. TRIAL—*where evidence supports a hypothesis it may be submitted in an instruction.* An instruction in a suit involving the question of rescission of a contract of sale may properly submit as part of its hypothesis whether an arrangement was made for daily delivery to parties named by the purchaser and presentation of bills to such parties, with collection from them, where there is evidence that such arrangement was made with the seller's salesman, in the former's presence, at the time the contract was signed.

10. SAME—*instruction that writings are to be construed together not erroneous.* An instruction that writings in question in a suit are to be considered and construed together as parts of one and the same contract is not objectionable, as leaving the construction of the contract formed by such writings to the jury.

11. SAME—*when mixed question of law and fact may be submitted to jury.* The court, after instructing as to the circumstances under which a seller of merchandise who has attempted to cancel a contract would have no right so to do, may, in another instruction, submit as part of the hypothesis whether such seller had a right to make such cancellation, the latter being a mixed question of law and fact.

12. APPEALS AND ERRORS—*a party cannot complain of errors in his own favor.* A seller sued for refusal to fulfill a contract for the sale of lard cannot complain, on appeal, of an instruction making the case hinge upon whether the lard was worth more than nine cents a pound at the time he attempted to cancel the contract, where the real question is whether the price was in excess of the contract price, which was eight cents per pound, the error, if any, being in his favor.

*Anglo-American Provision Co.* v. *Prentiss,* 57 Ill. App. 507, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY V. FREEMAN, Judge, presiding.

HERRICK, ALLEN & BOYESEN, for appellant:

Where a proposition and an acceptance are relied upon as constituting a binding contract, the latter must meet and close with the former at every point. Benjamin on Sales, sec. 39, note *c*; sec. 320, note *d*; sec. 562; *Maclay* v. *Harvey*, 90 Ill. 528; *Railroad Co.* v. *Shryock*, 9 Ill. App. 327; *Smith* v. *Wetherell*, 4 id. 655; *Fox* v. *Turner*, 1 id. 153.

A party who sues for the breach of performance of an executory contract must himself have performed all the conditions on his part before he can declare the other party to be in default. *Clark* v. *Weis*, 87 Ill. 438; *Smith* v. *Lewis*, 26 Conn. 110; *Bradley* v. *King*, 44 Ill. 340; *Coal Co.* v. *Ryan*, 107 id. 226; *Gardner* v. *Clark*, 21 N. Y. App. 399; *Stewart* v. *Many*, 7 Ill. App. 508; *Sawyer* v. *Railway Co.* 22 Wis. 403.

DUPEE, JUDAH & WILLARD, for appellee:

Where two or more instruments are executed at the same time between the same parties, relating to the same subject matter, they are to be construed together as parts of one instrument. *Preston* v. *Spaulding*, 18 Ill. App. 341; *Munson* v. *Osborn*, 10 id. 508; *Neill* v. *Chessen*, 15 id. 266; *Aid Ass.* v. *Bloom*, 21 id. 159; *Wilson* v. *Roots*, 119 Ill. 379; *Gardt* v. *Brown*, 113 id. 475; *Greenebaum* v. *Gage*, 61 id. 46; *Canterbury* v. *Miller*, 76 id. 355; *Stacey* v. *Randall*, 17 id. 467; *Hunter* v. *Silvers*, 15 id. 174.

The construction placed on the contract by the parties is entitled to great weight, and where reasonable will be adopted. *People* v. *Murphy*, 119 Ill. 159; *Burgess* v. *Badger*, 124 id. 288; *Short* v. *Kieffer*, 142 id. 266.

According to Blackstone, generally, in legal significance, the word "day" includes the time elapsing from one midnight to the succeeding one. 2 Blackstone's Com. 141.

The time for completing commercial transactions is not limited to banking hours. A person has the whole day to deliver and pay. *Hinton* v. *Locke*, 5 La. Ann. 514; *People* v. *Hatch*, 33 Ill. 137; *Zimmerman* v. *Cowan*, 107 id. 637.

The law knows no fraction of a day. 2 Taylor on Landlord and Tenant, par. 573.

A party who agrees to extend the time for the performance of a contract, and puts the other party off his guard, will be estopped from taking advantage of its non-performance in the time first agreed upon. *Longfellow* v. *Moore*, 102 Ill. 289.

Mr. JUSTICE BAILEY delivered the opinion of the court:

This was a suit in assumpsit, brought by Lewis M. Prentiss, against the Anglo-American Provision Company, to recover damages for the non-performance by the defendant of a contract evidenced by the two following instruments:

"CHICAGO, *March 17, 1886.*
"*Mr. L. M. Prentiss, Chicago:*

"We hereby agree and bind ourselves to sell to you two hundred and fifty thousand pounds (250,000 lbs.) leaf lard at eight cents (8c.) per pound, delivery of same to commence March 18 and to be consummated April 15, 1886, and to be made as follows, *i. e.*, ten thousand pounds daily, when the hogs cut by us enable us to deliver that quantity; but if on any day or number of days during the period mentioned our product falls short of 10,000 pounds, then we shall have the privilege of delivering enough on days when our product shall be in excess to make the average of our daily deliveries ten thousand pounds.

"Terms of sale—cash.

"Yours truly,     ANGLO-AMERICAN PROV. CO.,
                        ROBERT D. FOWLER."

"*March 17, 1886.*
"*Anglo-American Provision Company, Chicago:*

"DEAR SIRS—I have bought from, and hereby agree to take from you, 250,000 pounds of leaf lard at eight cents per pound, the delivery of which shall be commenced March 18 and consummated April 15, 1886, to be made as follows, viz: 10,000 pounds daily when your product

enables you to deliver that quantity, but if on any day or number of days during the period mentioned your product is less than that quantity, then you shall have the right to deliver on other days when your product shall be in excess, enough to make the average of your daily deliveries 10,000 pounds.    I shall pay bills daily.

LEWIS M. PRENTISS."

These two instruments seem to have been drawn up in the presence of both parties by O'Connor, the defendant's book-keeper, and were signed at the same time and place, the one signed by the defendant being delivered to the plaintiff and the one signed by the plaintiff being delivered to the defendant.    The parties at the time were sitting at the desk of McGregor, the defendant's salesman, and the evidence tends to show that as the papers were signed and delivered the plaintiff said to McGregor: "Now, you enter for the three days of this week, Thursday, Friday and Saturday, 10,000 pounds daily to C. H. Robison & Co., and make your invoices to them and collect the money from them.    In due time I will give you particulars where the next week's deliveries will go, and so on until the lard is provided for."    To this McGregor responded, "All right," and so entered it.    Deliveries of lard were accordingly made under the contract by the defendant for the first three days to C. H. Robison & Co., and bills therefor were rendered directly to and collections made from them.    In like manner for the remaining days of the month of March, and up to and including the first day of April, deliveries of lard were made by the defendant, under the contract, to other customers of the plaintiff and according to his directions, and in each case, up to and including March 30, bills were presented to and collections made by the defendant from the several parties to whom the deliveries were made.    In no case do the collections seem to have been made on the days on which lard was delivered, but usually from one to four days thereafter; but up to April 1 no bill for lard deliv-

ered was rendered to the plaintiff, nor were any applications made to him for payment, and there is no evidence tending to show that up to that time the defendant expressed any dissatisfaction with the mode of collections thus adopted or the promptness with which payments were made.

At about 11 o'clock in the morning of April 1 the plaintiff received from the defendant, by messenger, invoices for deliveries for the preceding day, amounting to $800, and was asked for payment. No information seems to have been given him at that time why the defendant had failed to collect from the deliverees nor whether bills had been presented to them, nor does he seem to have been advised that the defendant desired to change the method of making collections pursued up to that time. It appears that on April 1 the price of lard had risen in the market about two cents a pound, and that such prices continued during the residue of the period covered by the contract. The evidence tends to show that the plaintiff, on receiving the invoices for the previous day's delivery, with the request for payment, immediately communicated with the defendant's book-keeper by telephone, desiring to know what it meant, and received a reply that the book-keeper would write him by messenger. The plaintiff, however, declined to wait, but said he would go directly to the defendant's packing house and see the book-keeper. The latter, however, replied that he was coming down town and would meet the plaintiff at Clifton's office at 2:30 P. M., and the plaintiff accordingly went there and met the book-keeper. The latter then told the plaintiff that his customers had not paid promptly, and that he would bill no more goods to them. The plaintiff replied that he must be mistaken about their not paying promptly, but said he would see them, asking the book-keeper to wait until the plaintiff could see Fowler, the defendant's president. The book-keeper replied that Fowler would soon be down. The evidence also tends to show that the plain-

tiff told the book-keeper at this interview that the defendant could collect directly from him if it preferred, and that he would collect from his customers.

At about five o'clock the plaintiff was telephoned to call at Clifton's office, which he did at once and found the book-keeper there, who told the plaintiff that Fowler had not come down, but that he had communicated with him. The book-keeper then presented to the plaintiff a bill for deliveries made on that day, April 1, and at the same time handed him a written notice of the rescission and cancellation of the contract by the defendant, such notice being as follows:

"CHICAGO, *April 1, 1886.*

"*Dear Sir*—We hereby notify you that owing to your failure to pay cash for the leaf lard delivered you by us on contract of March 17, as required by terms of said contract, we now declare said contract canceled.

"Yours truly,

ANGLO-AMERICAN PROVISION CO.,
H. O. O'CONNOR."

At the time the bills for the preceding day's delivery were presented to the plaintiff for payment the evidence tends to show he did not have with him or in bank the money necessary to pay them, and he seems to have admitted his inability to pay them at that time, although he testifies that he could easily have obtained sufficient money for that purpose. Up to the date of defendant's attempted rescission of the contract about 130,000 pounds of lard had been delivered under it. From that time the defendant refused to make further deliveries, and the plaintiff thereupon brought this suit to recover damages for non-performance of the residue of the contract. The trial was by a jury, and they rendered their verdict finding the issues for the plaintiff and assessing his damages at $4300, and the court, after denying the defendant's motion for a new trial, rendered judgment in favor of the plaintiff for the amount of the verdict, and interest

thereon up to the date of the judgment, being, in all, $4322, and also for costs.   That judgment has been affirmed by the Appellate Court on appeal, and this appeal is from the judgment of affirmance.

The principal controversy at the trial was upon the question whether, under the facts disclosed by the evidence, the defendant, at the time of the delivery to the plaintiff of the notice of rescission, had the legal right to rescind the contract and to refuse a further performance of it, and as germane to that question it becomes essential to examine the terms and provisions of the contract itself.   In form it consists of two letters, one from the defendant to the plaintiff, and the other a reply by the plaintiff.   Counsel for the defendant insist that the first of these letters is in the nature of a proposition by the defendant to sell to the plaintiff 250,000 pounds of leaf lard, and that the second is in the nature of an acceptance of the offer thus made, and there being in one respect, as is claimed, a material variance between the proposition and the acceptance, it is argued that no contract was actually consummated between the parties, and that there was therefore no contractual obligation binding the defendant to make any further deliveries of lard to the plaintiff.   The supposed variance between the instruments consists in this : that the first letter makes the "terms of sale cash," while by the second plaintiff writes, "I shall pay bills daily."

It is undoubtedly the rule that where one party makes a proposition to another, an assent, to be valid so as to conclude an agreement or contract between the parties, must, in every respect, meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points and closing with them just as they stand.   It may be that an agreement of sale making the terms cash, and one where the purchaser agrees to pay bills daily, are materially different in their legal effect; but admitting that to be so,

157—33

we are inclined to the opinion that the conclusion sought to be reached by the defendant, viz., that no contract was consummated, by no means follows. Treating the defendant's letter as a mere proposition or offer, and the plaintiff's reply as an acceptance with a modification of terms, the case would seem to fall within the rule that an acceptance of a proposition with modifications constitutes, in law, a rejection of it, and the substitution in its place of a new proposition, which, to constitute a contract, must itself be accepted by the other party. (*Fox* v. *Turner*, 1 Ill. App. 153; *Brinker* v. *Scheunemann*, 43 id. 659; *Smith* v. *Wetherell*, 4 id. 655.) The acceptance, however, need not be in writing, but it may be made orally, or be inferred from the conduct of the other party.

It would thus seem to follow, that in this case the plaintiff's letter constituted a rejection of the proposition as made by the defendant and the substitution of an offer of his own, and while there is no indication of any express acceptance of such counter-proposition, such acceptance may be inferred from the fact that the defendant immediately commenced to deliver lard under it, and continued to perform the contract until about 130,000 pounds of lard had been delivered. If, then, the theory is to prevail that these two letters are to be regarded merely as steps in the negotiation of a contract, it must be held that the contract actually consummated by the parties is the one evidenced by the plaintiff's letter and a presumed acceptance of the terms thereby proposed by the defendant, and that by the contract thus concluded it was agreed that bills for lard delivered should be paid daily.

But in our opinion these letters cannot be regarded as mere steps in the negotiation of the contract, but as embodying and evidencing the contract itself, and although in the form of letters, they were both drawn up at the same time and by the same hand, and were signed simultaneously, and they are therefore to be considered

together as parts of the same contract. They are to be treated precisely as though both had been actually embodied in the same document, and in construing them force is to be given, if possible, to the language of both. The phrase "Terms of sale cash," used in one, is to be construed with the clause "I shall pay bills daily," used in the other, so as to render the two consistent with each other, and to give effect to both. Such construction, we think, presents no question of serious difficulty.

The phrase, "Terms of sale cash," is manifestly elliptical, and requires expansion to fully express the meaning intended, and the phrase is one which is susceptible of being, and is often, used in quite different senses. In the language of the commercial world, sales where it is intended that the purchaser is to have a short credit, as, for example, ten days, or even thirty days, are often termed cash sales, while the strict legal signification of a cash sale is undoubtedly one where delivery and payment are to be concurrent acts and be.performed at the same instant of time. The parties were all merchants, and not lawyers, and both letters were drawn up by one of their employees, who was not a lawyer. Doubtless if the clause under consideration had been used without any other part of the contract giving it interpretation, the strict legal construction would necessarily be adopted; but the parties, in stipulating that the terms of sale shall be cash, had an undoubted right to explain in the other parts of their contract the sense in which they were disposed to use this phrase, and this they did by stipulating that bills for goods delivered should be payable daily. The meaning of the two phrases, when construed together, may be expressed thus: "Terms of sale cash,—that is to say, or meaning thereby, that bills are to be presented and payment made each day for the goods delivered during the day." This construction does no violence to either phrase, but gives full effect to both.

It would seem clear that before plaintiff, under the terms of this contract, could be placed in default, it was incumbent on the defendant to render to him invoices or bills of the goods delivered, and that when bills were so rendered the plaintiff had the whole day in which to make payment. Up to April 1 all bills had been rendered to the plaintiff's customers and collections had been made from them. At eleven o'clock A. M. of April 1 a bill for the preceding day's deliveries was presented to the plaintiff and payment therefor demanded. He clearly had all of that day in which to comply with such demand, and as the law knows of no fraction of a day, and as there is nothing in the contract limiting the time of payment to banking hours or usual business hours, he had the entire twenty-four hours in which to make payment. It follows that at five o'clock P. M., when the notice of rescission was served on him, he was not in default, as the time within which he had a right to make payment had not yet expired; nor was he then in default for failure to pay for the goods delivered April 1, as the bill for those goods was presented to him for the first time concurrently with the service of the notice of rescission. At five o'clock P. M., when the notice was given, the time provided by the contract for payment of bills for goods delivered on April 1, or bills for goods delivered on the preceding day and rendered on April 1, had not expired, and the defendant had therefore at that time no right or power to rescind the contract. The notice of rescission was nugatory, and had no effect upon the plaintiff's rights. The law applicable to this branch of the case is, in our opinion, stated with substantial accuracy in the second instruction given to the jury at the instance of the plaintiff, that instruction being as follows:

"If the jury believe, from the evidence, that at the time the contract in evidence was made between the parties to this suit, or shortly afterwards, an arrangement was made between said parties whereby the defendant deliv-

ered daily, under the contract, the lard to third parties named by the plaintiff, and presented bills to such parties therefor and collected the same from them, and that such practice continued until April 1, 1886, and that prior to said April 1 no bills were presented to the plaintiff and no request for payment made to him, and that he had no notice of any delay on the part of such third parties in paying cash, daily, for such lard, or of any intention on the part of defendant to change or abandon such practice, then they are instructed that the defendant had no right to cancel said contract for any failure to obtain cash payments, daily, prior to said April 1.   If they also believe, from the evidence, that prior to said April 1 payments had been made to defendants for all deliveries prior to March 29, and that the bills for later deliveries were on April 1 for the first time presented to plaintiff, and payment thereof was on said April 1 for the first time demanded or requested of plaintiff, then they are instructed that the plaintiff had at least the whole of April 1 in which to pay for said deliveries and those of April 1, and if they believe, from the evidence, that defendant undertook to cancel said contract some time in the afternoon of said April 1, that such attempted cancellation did not terminate the contract or discharge the defendant from the obligations thereof."

Various criticisms are made by counsel upon this instruction, but most of them arise from theories of the law which seem to us to be erroneous, and which are in the main answered by what has already been said.

It is objected, however, that this instruction is erroneous because it submits as a part of its hypothesis that an arrangement was made between the parties whereby the defendant delivered the lard daily, under the contract, to the parties named by the plaintiff, and presented bills to such parties, and continued the same from then, etc.   It is said, in the first place, that there was no evidence supporting this hypothesis, the theory of the

evidence contended for by the defendant's counsel being, that the defendant's salesman merely received orders from the plaintiff as to the parties to whom deliveries should be made, and carried out such orders without any evidence of knowledge on the part of the defendant in respect thereto.   As we understand the evidence, and as has already been stated, the arrangement as to the delivery of the lard to the plaintiff's customers was made at the very time the contract was signed, and in the presence of the representatives of the defendant who negotiated and executed the contract, and that such arrangement was carried out by the defendant up to April 1.   We think that this was evidence of the arrangement sufficient to justify the hypothesis of the instruction.   The mere fact that such a mode of delivery and collection was pursued by the defendant up to April 1 is of itself evidence of either antecedent authority on the part of its salesman to make the arrangement supposed, or of a subsequent ratification of such arrangement by the salesman, which would be equivalent to antecedent authority.

The fact that the salesman testified that he had no authority to depart from the terms of the contract and had received no such authority does not seem to us to be important.   The arrangement as to the delivery of the lard to the plaintiff's customers was not a departure from the terms of the contract, but merely an appropriate means adopted for executing the contract.

Complaint is made of the first instruction given at the instance of the plaintiff, on the ground that it left the matter of the construction of the contract to the jury; but that instruction merely held that the writings in question "are to be considered and construed together as parts of one and the same contract."   We do not think the instruction obnoxious to the criticism thus made. It did no more than tell the jury that the two instruments constituted one and the same contract, and be-

yond that the question of the construction of the contract was not touched upon or involved in the instruction.

Complaint is made of the complainant's third instruction, which was as follows:

"If the jury believe, from the evidence, that the defendant, some time in the afternoon of April 1, 1886, notified the plaintiff that the defendant declared the contract in question canceled and would make no further deliveries thereunder, and that lard was then and there worth more than nine cents a pound, then the jury are instructed that if the defendant was not justified in making such cancellation and refusing to make further deliveries under the contract, then the plaintiff was under no obligation, after such notice, to pay for the lard already delivered under the contract, and not then paid for, before the time for all the deliveries under the contract had expired and the amount of the damages, if any, which the plaintiff had suffered by reason of the refusal of the defendant to make further deliveries, could be determined."

This instruction is somewhat inartificially drawn, but we are disposed to think that it is not materially erroneous. It is contended, in the first place, that the pivotal question in the case is by it made to turn upon whether lard was worth more or less than nine cents a pound, while that precise value had no such significance. We think the question, so far as the price of lard was concerned, was whether, at the time defendant sought to rescind the contract, and afterwards, the price of lard was in excess of the contract price, which was eight cents per pound. Making the case hinge upon whether it was worth more than nine cents per pound was in favor of the defendant, and if an error, would seem to be one of which it cannot complain.

It is furthermore contended that the instruction was erroneous in submitting to the jury the question whether the defendant was justified in making a cancellation of

the contract and in refusing to make further deliveries thereunder, those being questions of law. If this instruction stood alone the objection to it would be a serious one; but it is to be noticed that in the next preceding instruction (the second) the court instructed the jury as to the circumstances under which the defendant would have no right to cancel the contract, and having done so it was entirely proper, in another instruction, to submit to the jury, as a part of its hypothesis, that the defendant had no right to make such cancellation. Whether the defendant was justified in making the cancellation was really a mixed question of law and fact, and the jury, after being properly instructed as to the law, were competent to find the fact, and the third instruction merely required them to pass upon the mixed question of law and fact in the light of the preceding instruction as to the law. The instructions are to be considered together, and taking them together the jury were fully instructed as to the law, and no rule of law was submitted to them for decision.

Some other points are raised by counsel for the defendant, all of which have been carefully considered, but which, in view of the conclusions already announced, we do not deem it necessary to discuss at length. It is sufficient to say that, as we view the law of the case, none of them seem to be material. Among the rulings of the court thus called in question are certain modifications of the instructions to the jury asked by the defendant, and the admission of certain evidence over the defendant's objection. We are disposed to think that none of those rulings, even if erroneous, could have in any way prejudiced the defendant's rights, and that the points thus made are immaterial.

After carefully considering the whole case we are able to find no material error in the record, and the judgment of the Appellate Court will accordingly be confirmed.

*Judgment affirmed.*