## MORSE et al. v. TILLOTSON & WOLCOTT CO.

(Circuit Court of Appeals, Second Circuit. June 10, 1918.)

No. 175.

1. CONTRACTS ⊂⊃23—MEETING OF MINDS—ADDITIONAL AGREEMENT.

Where defendants accepted plaintiff's proposal to buy notes of a corporation to be organized by defendants, the notes to be secured by a mortgage on ships, plaintiff's demand for an abstract of title, and that the deal be not consummated until title was approved by its attorneys, did not warrant defendants in repudiating the agreement on the ground that there was no meeting of the minds, for the offer was impliedly conditioned that title was good.

2. CONTRACTS ⊂⊃28(3)—ACTION—EVIDENCE.

In an action for profits which plaintiff claimed to have lost because of defendants' breach of an agreement whereby plaintiff was to purchase notes of a corporation to be organized by defendants, the notes to be secured by a mortgage on a fleet of ships, evidence *held* to warrant a finding that a binding contract had been entered into.

3. CORPORATIONS ⊂⊃30(5)—ACTIONS—EVIDENCE.

In an action for breach of an agreement whereby plaintiff was to purchase notes of a corporation to be organized by defendants, the notes to be secured by mortgage on ships, *held*, that defendants could not escape liability on the ground the contract was one of promoters, which defendants were making as agents for a corporation then in existence, whose name was not disclosed.

4. CORPORATIONS ⊂⊃218—CONTRACTS BY STOCKHOLDERS—PERSONS BOUND.

Where persons agree that a corporation shall do a certain thing, which they can compel it to do because of their ownership of a majority of the stock, the corporation is not bound by the agreement; but such persons bind themselves individually, unless the agreement specifies to the contrary.

5. APPEAL AND ERROR ⊂⊃273(5)—REVIEW—SUFFICIENCY OF OBJECTIONS BELOW.

A general exception to a portion of the court's charge, which did not specifically point out the error relied on, is insufficient to warrant an appellate court in reviewing the same on error.

6. CONTRACTS ⊂⊃346(3)—ACTIONS—DEFENSES—PLEADING.

Where defendants repudiated a contract that plaintiff should purchase notes of a corporation they were to organize, the notes to be secured by a mortgage on ships, and impossibility of the condition as to insuring the ships was not pleaded as a defense, it cannot be relied upon.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Tillotson & Wolcott Company against Charles W. Morse and another. Judgment for plaintiff, and defendants bring error. Affirmed.

The plaintiffs in error, defendants below, will be hereinafter referred to as defendants, and the defendant in error, defendant below, will be referred to as plaintiff. The plaintiff is a corporation organized under the laws of the state of Ohio, with its place of business in the city of Cleveland. The defendants are citizens of the state of New York and residents of the Southern district thereof.

The action is for breach of contract. The complainant alleges that the plaintiff agreed to purchase notes of a corporation to be organized by defendants, which notes were to amount to $555,084, for the price of $518,000, and it al-

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

leges that the defendants undertook that the transaction should be carried out by the corporation, and afterwards repudiated the agreement.

The answer is a general denial, except it states that "there were negotiations between the plaintiff and the defendants, for the purpose of agreeing, if possible, upon a contract under which the plaintiff was to make a loan upon the credit of some or all of the ships named in the complaint; but the plain · tiff and the defendants failed to agree upon the terms of such loan, and no contract was entered into between the plaintiff and the defendants with respect thereto."

The case was tried before Judge Grubb and a jury, and a verdict was returned for the plaintiff in the sum of $31,416, with interest at 6 per cent. from March 16, 1916. The assignment of errors covers 27 printed pages. The complaint states three causes of action.

The first cause of action as stated in the complaint is that in the months of January and February, 1916, the defendants negotiated with the plaintiff for a loan to be made by it to the United States Steamship Company, or another corporation which was then being or had already been organized by the defendants and certain associates of the defendants, for the purpose of owning the steamships Huron, William Castle Rhodes, St. Paul, and Minneapolis, said loan to be evidenced by notes secured by mortgage upon said vessels; it was thereupon agreed between the plaintiff and defendants that the plaintiff should purchase notes of such corporation amounting to $280,000, in consideration of a loan by the plaintiff to such corporation of $266,000, bearing interest at 6 per cent. per annum, and secured by blanket mortgage upon said four vessels; that it was further agreed that the notes should mature in the amount and at the dates specified; that it was further agreed that the said notes should be executed by said United States Steamship Company, or other corporation organized by the defendants for such purpose, and that a blanket mortgage should be executed securing same by such corporation covering all of said vessels, and that there should be proper insurance covering the period of transit to the coast, rebuilding and refitting of the said ships upon arrival at the coast, and for all subsequent operations; that defendants repudiated their agreement on March 16, 1916, and plaintiff has been prevented by the defendants from making such loan to the said United States Steamship Company, or any other company owning and operating said steamships; that the plaintiff has been damaged in the sum of $14,000, being the profit or commission that would have been earned by it upon said loan.

The second cause of action as stated in the complaint, repeating the previous allegations, alleges that during the pendency of the negotiations the defendant applied for a further loan to be made on the security of three other vessels, to wit, McCullough, Owego, and Chemung, said loan to be evidenced by notes secured by mortgage upon said vessels; that it was thereupon agreed between the plaintiff and defendants that the plaintiff should purchase notes of such corporation, or other corporation which was then being or had already been organized by the defendants for the purpose of owning the said steamships, amounting to $450,000, in consideration of a loan by the plaintiff to such corporation of $412,500, bearing interest at the rate of 6 per cent. per annum and secured by blanket mortgage upon said three vessels; that it was further agreed that ·the said notes should mature in the amount and at the dates specified; that it was further agreed that the said notes should be executed by said United States Steamship Company or another corporation organized by the defendants for such purpose, and that a blanket mortgage should be executed securing same by such corporation covering all of said vessels, and that there should be proper insurance covering all the operations of said steamships; that in the course of the negotiations the steamship Chemung was sold, and, with the consent of the plaintiff, the stipulated notes were reduced by $175,000, making the net amount of the notes $275,000, and the net amount of the loan $252,084, yielding a profit or commission to the plaintiff of $22,916; that on March 16, 1916, the defendants repudiated their agreement and refused to complete the transaction, and the plaintiff has been damaged in the sum $22,916, together with the legal services and expenses incurred in the drafting of the mortgage of $443, making a total of $23,359.

The third cause of action as stated in the complaint, repeating the previous allegations, is that in the months of January and February, 1916, the defendants negotiated with the plaintiff for a loan to be made by it to the United States Steamship Company, or another corporation which was then being or had already been organized by the defendants and certain associates of the defendants, for the purpose of owning the steamships Huron, William Castle Rhodes, St. Paul, Minneapolis, McCullough, Owego, and Chemung, said loan to be evidenced by notes secured by mortgage upon said vessels. It was thereupon agreed between the plaintiff and defendants that the plaintiff should purchase notes of such corporation, of which the defendants should procure the execution, amounting to $730,000, in consideration of the loan by the plaintiff to such corporation of $678,500, bearing interest at 6 per cent. per annum, and secured by blanket mortgage upon said vessels; that it was further agreed that the said notes should mature in the amount and at the dates specified. It was further agreed that the said notes should be secured by the said United States Steamship Company, or another corporation organized by the defendants for such purpose, and that a blanket mortgage should be executed covering all of said vessels and that there should be proper insurance covering the period of transit to the coast, rebuilding and refitting upon arrival at the coast of such ships as were upon the Great Lakes, and proper insurance for all of said vessels for their subsequent operations; that in the course of the negotiations the steamship Chemung was sold, and with the consent of the plaintiff the amount of the stipulated notes was reduced by $175,000, making the net amount of said notes $555,000, and the net amount of said loan $518,084; that the plaintiff has been damaged in the sum of $37,359, being the amount of the profit and commission which it would have earned upon said loan as reduced, as aforesaid, together with legal services and expenses incurred in the drafting of the mortgage of $443.

The plaintiff has obtained a verdict in the sum of $31,416, with interest at 6 per cent. from March 16, 1916, and judgment has been entered in the sum of $33,810.51.

Beck, Crawford & Harris, of New York City (James M. Beck and Joseph W. Goodwin, both of New York City, of counsel), for plaintiffs in error.

Everett, Clarke & Benedict, of New York City (A. Leo Everett, of New York City, of counsel), for defendant in error.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). The action is upon a contract which, if made, was made by letters, by telephone communication, and by conversations. The existence of the contract was denied by defendants, who, admitting the negotiations, claimed that they never reached the stage where both parties agreed to the substantial terms, and the question whether the contract existed was therefore submitted to the jury under appropriate instructions. The parties began their negotiations on January 28, 1916, in Cleveland, Ohio, and on that day a letter was drawn up and signed by Mr. Tillotson, as president of the Tillotson & Wolcott Company, the plaintiff herein. The last paragraph of the letter read:

"An acknowledgment of this letter will be considered an acceptance, and we will then proceed to have the appraisal and classification made."

At the end of the letter there is indorsed thereon on the following day the words: "Accepted January 29th, 1916. B. G. Higley"—

the latter being one of the defendants herein. The important portions of the letter are as follows:

"Referring to our conversation of this afternoon, we understand that you and your associates have recently purchased four steamers, formerly owned by the Mutual Transportation Company. for the sum of $560,000, the steamers being the Huron, the William Castle Rhodes, the St. Paul, and the Minneapolis, and that you propose to make such changes as are necessary to fit them for the ocean trade. * * * We further understand that these boats are to be placed under a new corporation and that you desire to borrow 50 per cent. of their sound value as determined by appraisers of our selection and meeting with your approval, and for this purpose we will want Mr. Horatio N. Herriman of this city, or some representative of the American Ship Building Company.

"We are willing to make you a one year loan, to be dated February 1, 1916, payable with interest at the rate of 6 per cent. per annum payable semi-annually, at the Guardian Savings & Trust Company, Cleveland, trustee, and to pay you ninety-five and accrued therefor—subject to the following conditions: (1) The mortgage is to be the usual marine form, and is to provide that full fire and marine and P. & I. insurance be carried. (2) The vessels are to receive Lloyd's classification before the loan is made. (3) All excess earnings, pending the payment of the loan, are to be deposited with the trustee. In order to save you interest, we are willing to have the mortgage provide that all or any part of the bonds may be called at 101 at any time after three months by giving thirty days' notice. (4) All proceedings incident to the issuance of the mortgage are to be under the supervision of Messrs. Goulder, White & Gray of Cleveland, who will give us their opinion.

"We understand that your corporation will be affiliated with or a part of United States Steamship Company, recently organized under the laws of the state of Maine, and United States Steamship Company, organized under the laws of the state of New York. It is mutually agreed that we shall have the right to name a Cleveland director."

A few days after this letter was signed Tillotson learned that Charles W. Morse, the defendant, was associated with Higley in the enterprise, although Morse's name was not in the list of his associates as given in the above letter of January 28th. Thereafter most of the correspondence and telephone communications that Tillotson had concerning the matter were with Morse or his office, and there were a good many letters, a good many telephone messages, and some telegrams. On February 3d Higley gave a letter to a Mr. Sherman and a Mr. White, the president and treasurer of the several corporations which he stated had entered into contract for the purchase of the steamships named, and he added:

"They have the authority to execute necessary papers for obtaining mortgages on each of the several ships. We would thank you, if you could arrange to give them a check for 50 per cent. of the valuation of each boat, you to be protected by bill of sale pending completion of mortgage. If you wish this all in one company, we have organized the United States Steamship Company of New York, and the matter can be arranged in a like manner through that corporation. I believe we have conformed to all you require in this matter and hope you will expedite the same."

On the same day Higley wrote a second letter which was as follows:

"Confirming your letter of the 28th of January, the separate paragraphs contained therein regarding the four Lake boats: The first condition is all right. The second condition, we will need the loan before the Lloyds classification is made, but will not put the vessel to sea until it is classified. We believe

that all other conditions are correct. Regarding the three other boats, the McCullough, Chemung, and Owego, the above conditions do not apply."

On February 4th Morse telegraphed Tillotson that he wanted to arrange loan Monday morning and "can give you bill of sale of each ship pending legal matters and insurance." And thereupon Tillotson wrote Higley:

"It would be impossible for us to effect a loan on Monday for several reasons: (1) The trust deed and bonds could not be prepared so soon. (2) We have not yet received the details of the insurance policies. As I stated to you while you were here, this insurance matter is almost the most important thing pertaining to the loan. We must have a policy that is absolute in its terms and one which will meet the approval of our counsel. * * * It will be necessary, in our judgment, to have one mortgage on the three boats, and so, in order to save time, it may be best to use the United States Steamship Company of New York organization."

On February 18th Tillotson wrote Morse as follows:

"Our position has been the same from the very first time that we talked to Mr. Higley, which was over two weeks ago. In order to hasten events, at your and Mr. Higley's request, Mr. House and I visited New York a week ago Wednesday; and in each instance we have maintained the same position, that we must have fleet mortgages, one on the Chemung, Owego, and McCullough, the other on the four other boats. Had the insurance been obtained, the papers could have been prepared before this and our money would have been forthcoming. In order to save time, now, we strongly recommend that you cause the company to be organized, with the men whose names you gave us while we were in New York as officers and directors; let this company take over the McCullough and the Owego, and the Chemung later when she is ready. Upon the approval of our counsel of the companies and the policies of the proceedings incident to the organization of your company, we will advance the proportion of funds required and later the proposition of the Chemung. This can all be done by Monday or Tuesday, and it is the only feasible way to do it. We had hoped that you would send some one here to-day authorized to act for you, in order to facilitate matters for you."

On the same day Morse wrote the complainant, stating that they had organized the United States Steamship Company which would operate the vessels, and giving the names of the persons who had consented to serve on the board of directors and who were to be elected the next day. The letter continues:

"We are sending to you to-night Mr. Hexamer, of Parsons & Co., who will hand you this letter and give you all the information regarding insurance. We can't see where we could need anything more, but pending these affairs we would like to have $87,500 deposited to-morrow, and we will give you bill of sale from the Erie Railroad Company direct to you or anybody you may name for the ship, which guarantees title. If it is not direct from them, they must guarantee the title, as that is the agreement with us. We can fix the Owego at your convenience. The four Lake boats, Huron, Minneapolis, St. Paul, and William Castle Rhodes, we would like to take over next week and have you advance on the same. The Salvage Association will send a man to-morrow to Buffalo to get a valuation on the four ships that are there. For these four ships we paid $560,000, and we presume you will lend $280,000 on the four, which with the $450,000 on the other boats makes $730,000 altogether."

On February 21st Tillotson wrote Morse:

"Your letter of February 17th was just received this morning. There are two things that I do not seem to be able to impress upon you. Our requirements are: First. That the issue is to be a fleet issue; that is, one mortgage of

$450,000 on the three boats. We must know promptly what the name of the company will be which is to make the mortgage. Second. That the vessels must be insured to their full insurable value, Mr. Hexamer reports that he can probably place very close to the appraised value on each boat. Three weeks have elapsed since we first discussed this matter with Mr. Higley, and the bonds should have been out long before this. Mr. Hexamer has Mr. Goulder's requirements—one of them being that you will have to get the abstracts at once and send them on for approval. With the title established, the mortgage can probably be drawn within two or three days, and we will take one temporary typewritten bond pending the printing of the definite bonds. Full insurance must accompany; the insurance policies must be ready when the mortgage is ready for record."

On February 26th Morse wrote Tillotson:

"We would like to borrow on these ships, on each ship or on the four ships together, as you prefer, one-half of whatever they are valued at, not to exceed $70,000 on each ship, as we paid for them $140,000 apiece. We have already settled for the Owego and the McCullough, and made a payment on the Chemung, so we feel no hurry about these ships. The price we paid for the Owego is $325,000, for the McCullough $175,000, and for the Chemung $325,000. The Chemung will not be finished until the 1st of April. If you want to lend 50 per cent. on these three ships for one year at 6 per cent. and 5 per cent. commission, we would take the money on all seven. We would agree to deposit with you monthly from the earnings of the vessel one-twelfth of the amount of the loan with the right to take the bonds up. The four Lake boats we would like determined on Tuesday and we would like you to pay the money over right away. The three Erie boats that are here you can arrange at your convenience. We would prefer not to issue bonds, except possibly to the Trust Company on loan. But you can do as you like. The insurance as you know is already provided for. The organization of the company is fixed as we have before written you, and if you do not sell bonds you can take the name of the steamships in anybody's name which you may designate, or you can take it in the name of the steamship company we have organized and take a mortgage back with a note of the company."

In reply Tillotson wrote Morse on February 28th:

"We have explained to your counsel that it would be impossible for us to advance money on any boats until our counsel has seen the abstracts on them, and the mortgage has been prepared. We have been ready for two weeks to make the loan, which has been the result of so much telephone conversation and correspondence. Mr. Eaton knows exactly what is required. We will pay you, as heretofore indicated, $412,500 for $450,000 of bonds on the Chemung, Owego, and McCullough, payable on or before one year after date. The mortgage is to be in the usual marine form and is to provide for full insurance, as detailed to Mr. Eaton, and a sinking fund of one-sixth of the next maturing interest and one-twelfth of the principal to be deposited with the trustee each month; the payments into the sinking fund for principal to be used, if you desire, for retiring all or any part of the bonds upon thirty days' notice at 101. We assume that the four Lake boats can be sent through the canal, and that they can be fully insured pending their arrival at some point for reconstruction. With this assumption, and the assurance that the necessary changes are to be made and paid for, in order that the boats can be classified, so as to receive full marine insurance for coastwise trade, and Mr. Goulder or his firm advise us that the title is good, we will advance up to $280,000 on bonds at 92 and interest, assuming, of course, that your estimates of value are sustained. While the Guardian Savings & Trust Company will, I think, if necessary, advance the money pending the preparation of the mortgage, it is only a question of a few days when this can be done. Mr. House assures me that he very much prefers to have it done in the usual order. It is, of course, understood that all other details of the proposal submitted to Mr.

Higley, including the payment of costs incident to the issue, etc., are to be carried out."

On March 7th Tillotson wrote Morse:

"You can imagine our surprise when we learned from Mr. Eaton that the Chemung had been sold and that you were reducing the amount of bonds by $175,000. This action is entirely agreeable to us provided we do not lose thereby, and we, of course, shall expect that the $15,000, or thereabouts, which was the discount on $175,000 bonds against the Chemung, be paid to us."

On March 16th, Eaton, one of the attorneys for defendants, wrote the plaintiff company as follows:

"On my return to New York after my conversation with you yesterday, I find that it is impossible for us to meet the conditions imposed by the Guardian in connection with the proposed loan about which we have been negotiating, and we are therefore reluctantly obliged to accede to your suggestion that the proposition be canceled. This is a matter of regret to Mr. Morse, as I realize it is to you, but under the circumstances there is nothing further that can be done."

In reply to the above, Mr. Milligan, the vice president of the plaintiff company, wrote:

"We have your letter of March 15th, signed by Mr. Eaton, to the effect that you are obliged to cancel your sale of bonds to us. In view of the fact that Mr. Tillotson had this matter in charge, your letter will be referred to him upon his return from the South this week."

And on March 21st Morse wrote Milligan:

"Your favor of the 20th at hand. We know of no sale of bonds to you which you mention in your letter, and we know of no cancellation on our part. We surely tried hard enough to do business with you and regret very much that we could not."

If a contract existed, it evidently was intended that it should be canceled by the letter of March 16th. Milligan, to whom the letter was addressed, had his attention called to the statement that defendants were "reluctantly obliged to accede to your suggestion that the proposition be canceled," and he was asked when on the stand whether he had made any such suggestion. And his reply was: "Absolutely not." The writer of the letter of cancellation testified that in an interview in Cleveland, on March 2d, with the president of the plaintiff company, the latter said to him that the whole matter was in quite unsatisfactory shape, and "that they did not seem to be making any progress at all toward bringing the transaction to a close, and he added that that was the more unsatisfactory to him because he did not suppose that he had any definite contract with Mr. Morse in regard to it." But the president of the company was then recalled to the stand and asked whether he had ever made any such statement, and denied absolutely that he ever did. He was then asked, "How certain are you that you did not make such a statement?" The answer was, "I am very positive, sir." There was here a disputed question of fact, and evidence which justified the jury, if they believed it, in concluding that the contract, if one existed, was canceled by the defendants.

[1] The defendants assert that the minds of the parties never met, that one of the conditions of the agreement was that the attorneys for

the plaintiff were to be furnished with abstracts of title to the ships and that they were to examine them, and that the deal was not to be consummated until the title was approved. In the letter dated February 28, 1916, written by the president of the plaintiff corporation the writer stated that, when the attorneys "advise us that the title is good, we will advance up to $280,000 on bonds at 92 and interest." And there is no evidence in the case that, when defendants on March 16th canceled the agreement, the plaintiff's counsel was satisfied that the titles were good or that he had rendered any opinion on that subject. It will no doubt be conceded that an offer to sell implies that the title is marketable. And if an offer to sell is made by A. and accepted by B., subject to the title being found good upon examination, it hardly seems that the words "subject to the title being found good" import any new term into the acceptance, so as to prevent a meeting of the minds upon the offer as made.

In Hussey v. Horne-Payne, L. R. 8 Ch. Div. 670 (1878), an offer was made to sell land for a specified sum of money, and the offer was accepted "subject to the title being approved by our solicitors." The defendants afterwards declined to complete the sale, the title not yet having been approved, and the plaintiff claimed specific performance. The Vice Chancellor had held that the offer had been unconditionally accepted, and the demurrer was overruled. The case was carried to the Court of Appeal, where it was reversed, and the demurrer was sustained. In his opinion Jessel, M. R., said:

"The expression 'subject to the title being approved by our solicitors' appears to me to be plainly an additional term. The law does not give a right to the purchaser to say that the title shall be approved by any one, either by his solicitor, or his conveyancing counsel, or any one else. All that he is entitled to require is what is called a marketable title, or, as it is sometimes called, a good title. Therefore, when he puts in 'subject to the title being approved by our solicitors,' he must be taken to mean what he says; that is, to make it a condition that solicitors of his own selection shall approve of the title."

The case was carried to the House of Lords (L. R. 4 A. C. 311), where it was affirmed, but upon different ground. The House of Lords did not agree with the Court of Appeal upon the point upon which that court decided the case. Upon that point the Lord Chancellor (Earl Cairns) declared that he was disposed to look upon the words "subject to the title being approved by our solicitors" as meaning—

"nothing more than a guard against its being supposed that the title was to be accepted without investigation, as meaning in fact the title must be investigated and approved of in the usual way, which would be by the solicitor of the purchaser. Of course, that would be subject to any objection which the solicitor made being submitted to decision by a proper court, if the objection was not agreed to."

The thing sold in that case happened to be land; but the decision would have been the same, had it been bonds or ships.

Counsel for defendants, however, in this connection rely upon Village of Ft. Edward v. Fish, 86 Hun, 548, 33 N. Y. Supp. 784 (1895), which was afterwards affirmed by the Court of Appeals (156 N. Y. 363, 50 N. E. 973). In that case the plaintiff, the water commissioners of the village, had entered into an agreement with defendant to sell to

him certain water bonds, which they were to issue, for less than par. The agreement contained a provision stating that it was not to be binding on the party of the second part unless certain attorneys, which it named, "approve of the regularity and validity of said bonds in writing." The attorneys in question telegraphed the commissioners:

"Think that the present board of trustees must reorganize as water board and give new bonds before bonds can be issued."

The water commissioners, regarding this as an adverse opinion from the attorneys as to the regularity and validity of the bonds, telegraphed to defendant that they withdrew from the agreement. They then sold the bonds to the state comptroller. This was on July 28, 1893, and on August 4, 1893, the defendant notified the water commissioners that the clause in the contract requiring the approval of the attorneys was for his benefit, and that he waived such approval and demanded delivery of the bonds or payment of damages. The court held that the contract to sell the bonds for less than par was illegal and void. The court, however, added that, when the plaintiff on July 28th was informed by the attorneys of their refusal to approve the bonds, the "plaintiff then (if not before) was freed from any obligation to defendant under the contract." "On that date defendant was not bound to take the bonds. It follows that plaintiff was not bound to deliver them." The court admitted that the provision requiring the approval of the bonds was for the benefit of defendant and probably might have been waived by him. "But he did not make such waiver," said the court, "until after plaintiff, as it lawfully might, had acted on the assumption that the contract was at an end. The waiver was too late."

We do not challenge the correctness of the conclusion reached, and the case may easily be distinguished from the case at bar in important particulars, only one of which it is necessary to mention. It is evident that no contract at any time existed in the New York case between these parties, for the writing expressly declared that:

"This agreement is not to be binding on the party of the second part unless [the attorneys] approve of the regularity and validity of said bonds in writing."

As the attorneys named never approved the bonds, of course the party of the second part never was bound; and, if the party of the second part was not bound, the party of the first part was not bound. There is a clear difference between an agreement to sell "subject to the approval" of title by counsel and an agreement which declares that the entire writing is not to be binding unless a certain thing happens which never happens. Hussey v. Horne-Payne was not referred to in the opinion in Village of Ft. Edward v. Fish. But, if we are wrong in thinking that any real distinction exists between Hussey v. Horne-Payne and Village of Ft. Edward v. Fish, we prefer to follow the former in its application to the facts of this case. An acceptance which in terms is conditioned on what the law implies is a good acceptance, as it introduces nothing new into the contract. See Anglo-American, etc., Co. v. Prentiss, 157 Ill. 506, 42 N. E. 157; Ottumwa, etc., Co. v. Ainley, 109 Iowa, 386, 80 N. W. 510; Hubbell v. Palmer, 76 Mich. 441, 43 N. W. 442; Page on Contracts, vol. 1, p. 78.

[2] The plaintiff does not claim that the writing of January 28th was a completed draft of the contract. It is not pleaded as such. The transaction was difficult and complicated, and a number of items remained to be gone over and agreed upon, and they were not all definitely settled until the mortgage agreement was drawn. The plaintiff contends that when that was drawn every doubtful or disputed point had been resolved and finally determined, and nothing remained to be added to it or subtracted from it. The writing of January 28th between Tillotson and Higley was that the plaintiff should purchase bonds to be secured by a mortgage on the four boats known as the Lake boats, and that this mortgage was to be drawn under the direction and approval of certain specified attorneys of Cleveland. In the interview on March 2d between the plaintiff's attorney, Mr. White, and defendants' attorney, Mr. Eaton, of Boston, Mr. Tillotson said:

"Now, we have agreed upon all the details of this loan, and we want you [White] to get right busy and draw the mortgage, and Mr. Eaton [representing defendants] is out here for the purpose of getting these details cleaned up and out of the way just as fast as possible."

He also at that time declared that the agreement was to put all the boats under one mortgage. All this was said without Mr. Eaton's contradiction. And White and Eaton worked together for several days, and drew up the mortgage, and it contained all the terms, securing notes to the amount of $730,000, which was reduced afterwards to $555,000, because of the sale of the Chemung. Mr. White had been employed for 17 years in the business of drawing such mortgages, and had drawn 200 or 300 of them. He testified that there were no unusual terms in the mortgage as finally agreed upon. He was asked on the stand whether Mr. Eaton objected to any provisions as unusual. He answered:

"No; there was, of course, in framing the language, some discussion as to just the wording, or verbiage, or things of that kind; but the drawing of the mortgage from the start to the finish was simply a friendly collaboration, without any differences."

Mr. White was asked whether Mr. Eaton called up his principals during the course of these four or five days of negotiations. His answer was:

"Mr. Eaton used the long distance phone a number of times. He would, of course, retire to another room, and I had no means of knowing with whom he conversed, except as he would come back and say that he had received word of something or other, and then we would go on working with the mortgage."

Then he was asked:

"Did he make decisions after going to the telephone which he was not able to make before going to the telephone?"

To which he replied:

"I don't know whether he was able to before or not; but when we were discussing the different phrases of the mortgage, I know he would go to the telephone, and then come back, and we would go on, and those points would be arranged, but whether he received authority from any one I don't know."

And Mr. Eaton, when on the stand, admitted that he was talking over the telephone with Mr. Morse in New York. After these two attorneys had completed the mortgage, Mr. Eaton said that Mr. White told him that he (White) wanted—

"to go over it with Mr. Tyler, who had had a great deal of experience with these mortgages for Mr. Tillotson, and I told him of course I would want to take it back to Mr. Morse and to Mr. Blodgett [Eaton's partner] at my end of the line."

Mr. Morse was asked on his direct examination whether he ever authorized Mr. Eaton to make any contract in his behalf, and he answered:

"I told him to go to Cleveland and to stay there until he got the money."

The jury could draw their own conclusions from such a reply. The mortgage, however, was taken to New York and submitted to Morse, and some days later there was a meeting in New York, at which two of the plaintiff's attorneys and Morse and other of Morse's associates were present. One of these attorneys was asked at the trial what, if any, objection was raised by Morse or any of his associates as to the terms of the mortgage agreement. He replied, "Absolutely none." He afterwards corrected himself, by saying that Morse wanted to have individual mortgages given, instead of a fleet mortgage; but that was not consented to, as being contrary to what had been originally agreed upon. And the jury was instructed with unusual particularity as to the circumstances under which they would be authorized, if reasonably satisfied from the evidence, to find that the minds of the parties had met upon the terms of the mortgage.

This court is of the opinion that the defendants were not prejudiced by the instructions, and that there was sufficient evidence to warrant the verdict which was reached. It is evident that the jury did not accept all that Mr. Eaton and Mr. Morse testified to; but that was their privilege. Mr. Eaton's testimony in certain particulars was flatly contradicted by others; and Mr. Morse admitted on the stand that he had been convicted of a crime. The mortgage as drawn by the respective attorneys was not in the nature of an offer submitted by one party to another, and which was not responded to by the offeree. The offer had been made and accepted prior thereto, with certain details left open, which had been determined when the mortgage was drawn.

The action was brought upon the theory that a contract had been made between the plaintiff and the defendants for a loan upon the credit of the ships named in the complaint, and that the use of the corporate form for executing the mortgage on the ships was for the convenience of defendants, so that they should not have to assume any personal liability. That seems to have been the theory of defendants themselves, when the answer to the complaint was filed; for after stating that there were negotiations between themselves and the plaintiff, for the purpose of agreeing, if possible, upon a contract, it declares that they failed to agree, and no contract was entered into.

[3, 4] But at the argument in this court the defendants advanced the proposition that the contract was a contract of promoters, which the

defendants were making as agents for a corporation then in existence, whose name was disclosed to the plaintiff, and that therefore the plaintiff could not recover. They still adhered, however, to their contention that the negotiations did not result in any meeting of the minds. We find it quite impossible to concur with counsel in the view that defendants were acting as agents for a principal, disclosed or undisclosed. They acted for themselves, as clearly appears from the letter of January 28th. Unless defendants were bound by that letter, there was no obligor on the promise to the plaintiff, for at that time the corporation which was to take over the boats had not been agreed upon. But before March 16th, when the contract was canceled, it had been determined what corporation should take over the boats, and the cancellation was made by Eaton, who does not pretend that he had been authorized formally or informally by the corporation to cancel. The inference is that Eaton was acting for Morse, and neither Eaton nor Morse could have been acting at that time as a promoter for the corporation, for it was already formed, and neither could have been acting for the corporation, for it never gave either authority to represent it in the matter. Moreover, where two or more persons agree that a corporation shall do a certain thing, which they can compel it to do, because they hold a majority of the stock, or otherwise, the corporation is not bound by their agreement, but they bind themselves individually, unless it is expressly agreed that the other party is looking to the corporation, and not to the promoters. See Harrill v. Davis, 168 Fed. 187, 94 C. C. A. 47, 22 L. R. A. (N. S.) 1153; Fentress v. Steele & Sons, 110 Va. 578, 66 S. E. 870.

[5] In the brief submitted by defendant's counsel upon the argument in this court, and upon the oral argument, stress is laid upon the fact that the judge instructed the jury to say whether there was a meeting of the minds "as to each material stipulation in the contract," and again as to the "substantial terms of the contract." If this were error, the question cannot be raised in this court, for it was not properly excepted to at the time. The exception taken was to a statement which included the matter now objected to, along with other matter, without directing the court's attention specifically to the point now made. The objection was, "I take an exception to your honor's remarks." Under the circumstances it was not sufficient. We may call attention, however, to the fact that the court in the charge directed attention specifically throughout the charge to the essentials of an agreement to sell something in the future, and as to what the minds of the parties must have met in agreement upon. What more the court should have said upon that point to a jury whose province it was to determine whether a contract existed is not apparent to us; but, if it was to counsel, it was his duty at the time to call the attention of the judge specifically to it, which he did not do.

[6] One of the assignments of error relates to that portion of the charge to the jury in which it was said:

"As I understand it, the impossibility of performance with reference to the insurance feature is not made a matter of defense to the action, except as it reflects on the matter of evidence as to whether the parties did agree on the contract as it is claimed by the plaintiff, and therefore the question in the

main would be whether or not there was a meeting of the minds between the two parties as to each material stipulation in the contract."

We are unable to see error in the above statement. It is said that the agreement was impossible of performance, inasmuch as it was impossible to insure during the war, in the manner specified, vessels intended to be used in the trans-Atlantic service. There was some evidence that the insurance required could not be obtained, and there was also evidence that it could be; a marine insurance agent testifying as follows:

"There has been no time since the war broke out when such an insurance could not be secured in accordance with the claims specified in that article 3."

Impossibility of performance may or may not discharge from the obligation of a contract, according to circumstances; and where performance is possible when the contract is made, and becomes impossible subsequent to the making, it is very generally held that the promisor is not discharged. But impossibility of performance does not appear to have been pleaded, and so could not have been relied upon as a defense to the action, except in the particular referred to in the charge. As respects that phase of the subject, there was a question of fact for the jury.

There are other assignments of error, which we have considered, but do not find it necessary to prolong this opinion by considering in detail.

Judgment affirmed.