Conard *v.* Pennsylvania Railroad Company, Appellant.

*Contract—Sale of chattels—Executed and executory contracts.*

An executed contract for the sale of a chattel vests the title at once, but an executory contract always leaves something to be done before the title to the property will vest in the purchaser. When, however, the act is performed, the sale is complete and the title to the property passes. And in cases where personal property of a certain description is purchased but not identified or selected from a mass of like property of the vendor, the contract is executory and incomplete and the title to it remains in the vendor. As soon, however, as the purchaser makes a selection of a particular part of the property in pursuance of his contract and his act is approved by the vendor, the sale is complete and the title of the vendor is divested.

Where a person agrees to sell steel rails of a certain quantity and quality "conditioned upon the rails being first inspected" by the vendee, and

accepted as fit for his work, a refusal by the vendor to permit the vendee to inspect the rails, or to furnish rails for an inspection, is a breach of the contract, for which the vendor will be liable. If in such a case, the evidence for the vendor is in effect that he submitted for inspection rails of the quantity and quality mentioned in the contract, but that the inspector refused to inspect them, and selected other rails not offered by the vendor, while the evidence for the vendee is in effect that he inspected and selected rails of the kind and quality mentioned in the contract, and that the vendor refused to deliver them, the case, on such conflicting testimony, is for the jury.

Argued Jan. 5, 1906.    Appeal, No. 187, Jan. T., 1905, by defendant, from judgment of C. P. No. 2, Phila. Co., March T., 1900, No. 754, on verdict for plaintiff in case of Thomas P. Conard and I. S. Williams, trading as Thomas P. Conard, v. Pennsylvania Railroad Company. Before MITCHELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Assumpsit for breach of contract of sale.    Before BAR-RATT, J.

The fact are stated in the opinion of the Supreme Court.

At the trial the court refused to charge that upon all the evidence the verdict should be for the defendant.

Verdict for plaintiff for $8,588.

The defendant moved for judgment non obstante veredicto under the Act of April 22, 1905, P. L. 286. The court overruled the motion. Defendant appealed.

*Errors assigned* among others were (16) refusal of binding instructions for defendant, and (17) denial of motion for judgment non obstante veredicto.

*Edwin J. Sellers*, of *Sellers & Rhoads*, for appellant.

*Alex. Simpson, Jr.*, with him *C. Wilfred Conard*, for appellee, cited: Records v. Railroad Co., 9 Phila. 55; Isherwood v. Whitmore, 11 M. & W. 347; Erwin v. Harris, 87 Ga. 333 (13 S. E. Repr. 513); Fessler v. Love, 48 Pa. 407; Bucklin v. Davidson, 155 Pa. 362; Kimports v. Breon, 193 Pa. 309.

OPINION BY MR. JUSTICE MESTREZAT, February 26, 1906:
The plaintiff, desiring to purchase some second hand steel

rails, fit for relaying, had a conversation with the defendant company's agent relative thereto. Pursuant to and in confirmation of the oral negotiations, Joseph T. Richards, the defendant's chief engineer of maintenance of way, addressed a letter to the plaintiff under date of June 21, 1899, the material parts of which are as follows :

"Subject. With reference to sale of 1250 tons of second hand fit rail, with splice material . . . . Confirming my verbal conversation with your Mr. I. S. Williams, and my telephone message of this afternoon, we can let you have 1250 tons of second hand fit steel rail originally 70 lbs. per yard, delivered f. o. b. cars Harrisburg, Pa., at $19.75 per gross ton for the rails and 30 cts. per pair for the splices, exclusive of bolts, delivered at the same place, both conditioned upon the rails being first inspected by you on the ground and accepted as fit for your work, otherwise the sale not to stand, as we cannot furnish the rails from any other points than the Northern Central Ry. lines, and P. & E. Ry. lines, from which these rails are reported as being on hand. . . . This sale is made conditioned on payment therefor being made cash upon presentation of shipping invoices to you and before cars are released by us to you. Please advise whether this is in accordance with your understanding and acceptable to you." In several subsequent letters during the same month, Mr. Richards wrote the plaintiff indicating the places on the two divisions of the defendant's road where the rails could be found by the plaintiff for inspection. Under date of June 28, 1899, the plaintiff addressed a letter to Mr. Richards at the defendant's general office in Philadelphia as follows : "I agree to take twelve hundred and fifty (1250) tons of seventy (70 lbs.) relaying rails at Nineteen and 75/100 ($19.75) Dollars per gross ton f. o. b. cars Harrisburg, Pa., and splices for same at thirty (30c) cents per pair, subject to inspection. My inspector has looked over the rails at Parkton and has selected about three hundred (300) tons that he can use. . . . My inspector has gone to Renovo to inspect the other rails on the P. & E. division and have wired him that your supervisor will meet him at Renovo." In a subsequent letter to the plaintiff, dated July 25, 1899, Mr. Richards states that his company had for sale 2,240 tons of rails of the character described in his letter of June 21. Of

the quantity of rails sold to the plaintiff about twenty-seven
tons were delivered to him by the defendant.   The plaintiff al-
leging a breach of the contract, brought this action.

In the statement, the plaintiff avers substantially that a con-
tract was entered into by the parties by means of the communi-
cations referred to for the sale and purchase of 1,250 tons of
second hand, originally seventy pounds per yard, steel rails
fit for relaying, at $19.75 per gross ton; that he had complied
with his part of the contract by giving shipping instructions
and by sending inspectors to make the inspection of the rails
to the places designated by the defendant; that at no time
were the inspectors shown the number of rails of the qual-
ity and character called for by the contract and which the
defendant agreed to show; that the defendant company shipped
to the plaintiff 27 620/2240 tons but refused to ship any
more rails or allow him to inspect or select any other
rails.   The defense, at the trial, was that the plaintiff had
not made the inspection in accordance with the agreement;
that the inspectors who made it were not the plaintiff's
agents; that there had been no acceptance upon the ground
of the rails offered by the defendant "and, consequently,
that no sale stood or was effected."   The learned trial judge
submitted the case to the jury which returned a verdict for
the plaintiff.   From the judgment entered on the verdict this
appeal was taken by the defendant.

Many, if not the greater number of the assignments of error
are clearly in violation of the rules of court and will not be
considered.   Under the sixteenth and seventeenth assignments,
however, the material questions in the case may be raised and
disposed of.

There were two questions for consideration before the court
below: one of law, for the court; and the other of fact, for the
jury.   The first question, which was for the court, was whether
the letters which passed between the parties constituted an
executory contract of sale of the rails described in the defend-
ant's letter of June 21, 1899.   This letter was explicit as to
the quantity and quality of rails offered for sale and also as to
the terms of the sale.   The company proposed to sell "twelve
hundred and fifty (1250) tons of second hand fit steel rails
originally seventy (70 lbs.) per yard, delivered f. o. b. cars

Harrisburg, Pa., at nineteen and 75/100 ($19.75) dollars per gross ton for the rails and thirty (30c) cents per pair for the splices exclusive of bolts, delivered at the same place, both conditioned upon the rails being first inspected by you on the ground and accepted as fit for your work, otherwise sale not to stand." The plaintiff by his letter of June 28, 1899, accepted the offer to sell on the terms in which it was made. That the defendant company's own interpretation of the correspondence was that it constituted a contract of sale of the rails is clearly shown by its letters to the plaintiff written subsequently to the proposal contained in its letter of June 21. That letter shows that the subject of the conversation, between the parties, prior to its date, was " with reference to sale of twelve hundred and fifty (1250) tons of second hand fit rail with splice material." The several subsequent letters of the defendant treat the sale as having been made. That of July 6, 1899, says in opening : " Referring to the subject of the inspection of the 1250 tons of rails sold by us to you," and then refers " to my letter of June 21, confirming this sale." Again, the letter of July 25, 1899, opens as follows : " Referring to the subject of the second hand fit for track rails which we have to dispose of on the P. & E. and Northern Central Ry., and of which we sold you 1250 tons subject to your inspection." The defendant company's letters show conclusively its interpretation of the contract and that it was a sale of 1250 tons of second hand steel rails, fit for relaying and originally of seventy pounds weight per yard at $19.75 per ton, " conditioned upon the rails being first inspected by you on the ground and accepted as fit for your work, otherwise the sale not to stand."

An executed contract for the sale of a chattel vests the title at once, but an executory contract always leaves something to be done before the title to the property will vest in the purchaser. When, however, the act is performed, the sale is complete and the title to the property passes. And in cases like the present, where personal property of a certain description is purchased but not identified or selected from a mass of like property of the vendor, the contract is executory and incomplete and the title to it remains in the vendor. As soon, however, as the purchaser makes a selection of a particular part of the property in pursuance of his contract and his act is approved

by the vendor, the sale is complete and the title of the vendor is divested. Mr. Benjamin in his excellent work on Sales (Bennett's 7th edition, p. 329) says : " After an executory contract has been made, it may be converted into a complete bargain and sale by specifying the goods to which the contract is to attach, or, in legal phrase, by the appropriation of specific goods to the contract. The sole element deficient in a perfect sale is thus supplied. The contract has been made in two successive stages, instead of being completed at one time, but it is none the less one contract, namely, a bargain and sale of goods. As was said by HOLROYD, J., in Rohde v. Thwaites, 6 B. & C. 388, ' the selection of the goods by one party, and the adoption of that act by the other, converts that which before was a mere agreement to sell into an actual sale, and the property thereby passes. . . .' If it has been agreed that the purchaser shall select out of the bulk belonging to the vendor, it is not easy to raise a controversy, but the cases in which the ablest judges have been much perplexed are those where the vendor is, by the express terms of the contract, entitled to make the selection."

When the condition stated in the contract before us which required an inspection and selection was performed, the agreement became executed and the sale was complete. It was the duty of the purchaser to make an inspection of the rails and select such as, in quality and size, conform to the rails called for in the contract. Having made the selection with the approval of the vendor, the sale was complete and the title passed to the purchaser. The duty of the defendant company under the contract required it to afford the plaintiff an opportunity to inspect and select from the second hand rails on its Northern Central and Philadelphia & Erie divisions 1,250 tons of the quality and size provided in the agreement. The quantity as well as the quality was fixed by the agreement and the failure to give the plaintiff an opportunity to select either the quantity or the kind of rails specified in the agreement would be a breach of the contract, for which the defendant would be liable. The refusal to furnish rails for an inspection, or to permit an inspection to be made, is equivalent to refusing to deliver rails which had been inspected and selected by the plaintiff.

The court having interpreted the letters as constituting a

contract for the sale and purchase of the rails, it was the province of the jury to determine whether the defendant had, as alleged by the plaintiff, violated its terms. There was ample evidence to justify the court in submitting the question to the jury. If the testimony on the part of the plaintiff was believed, it showed that he had sent inspectors to the places designated by the defendant on both divisions of the road to make inspections of the rails submitted by the defendant and to select such as were included within the terms of the contract. These inspectors were called, and their evidence was to the effect that the defendant company refused to ship a large number of rails which they had selected, that it submitted for inspection rails of another and an inferior quality, and that it declined to permit them to make further inspection of second hand fit rails, although there was a sufficient quantity of such rails to have filled the contract. It was conceded that the defendant company had on hand at this time a sufficient number of such second hand rails taken from its Northern Central and Philadelphia & Erie divisions to supply the plaintiff's demands. It was claimed by the plaintiff that his inspection was fair and that he showed a willingness to have a reinspection by a disinterested party, as disclosed by his letter of July 25, 1899, to Mr. Richards, in which it is said: "If you think our inspection too severe, we will have the rails reinspected by Hunt's Agency of New York." The defendant company, in support of its defense, introduced evidence to the effect that it submitted for inspection an abundance of rails of the kind referred to in the correspondence, but the plaintiff's inspectors refused to inspect them and selected other rails not offered by the defendant and which the inspectors were told the plaintiff could not have. The defendant claimed that the plaintiff's inspection was unfair and that it had submitted 2,240 tons of rails for inspection, out of which there had been a selection of only about twenty-seven tons, and that for this reason, by the letter of July 25, 1899, it had canceled the order.

These questions of fact were necessarily for the jury, and their solution would determine the plaintiff's right to recover. The court told the jury if they found that the defendant company had submitted for plaintiff's inspection on its two divisions 2,240 tons of the kind of rails mentioned in the contract,

and the plaintiff's inspectors had accepted only twenty-seven tons, which it was conceded had been delivered, then there was no breach of the contract by the defendant company, and there could be no recovery against it. On the other hand, the learned judge also instructed them that if the defendant refused to deliver to the plaintiff the rails accepted by him it would be a breach of the contract, and that " if the defendant company had a sufficient number of these second hand fit steel rails from which the plaintiff, if he had been given an opportunity to inspect them, would have been able to accept the entire amount called for by the contract—1,250 tons—and if it refused to permit the plaintiff to inspect those rails, and in that way preventing him from getting the full amount of rails stipulated by the contract, the defendant broke its contract with the plaintiff; and the plaintiff in that event has made out his case, and all that remains for you is to fix the amount of his damage. It was the duty of the defendant company to submit to the examination of the plaintiff's inspectors ' fit steel rails,' and if it submitted rails of another and inferior quality, it failed to live up to the terms of its contract. This raises a pure and simple question of fact that you must determine from the evidence alone."

We think the learned judge correctly interpreted the contract and properly submitted the questions of fact for the determination of the jury, and, therefore, the judgment is affirmed.