### GUIONNET v. SPECHT.*

(District Court, W. D. Pennsylvania. February 24, 1923.)

1. **Sales ⊛1(1)—Contract held not to have become effective because of nonperformance of conditions precedent.**

A contract for sale of coal, which required the seller to give a bond satisfactory to the buyer, and the buyer, on acceptance of the bond, to make an advance payment and establish a credit, and providing that, unless "all these preliminaries" were completed by a certain date, the contract should be null and void, *held* not to have become a completed and enforceable contract, where none of such preliminary acts were done.

2. **Sales ⊛22(3)—Assent to contract must be unqualified.**

A contract of sale is not complete where the buyer retains an option to refuse his assent.

3. **Brokers ⊛52—Broker held not entitled to commissions under contract.**

An agreement by which defendant promised, "in the event of the consummation of a contract" for the sale of coal, to pay plaintiff a commission of 50 cents per ton "out of the proceeds realized by me from the sale of the coal covered by any such contract as received," *held* not to create a liability, where not only there was no coal delivered, but no valid contract of sale was consummated.

At Law. Action by Victor Guionnet against Charles E. Specht. On statutory demurrer to statement of claim. Demurrer sustained. See, also, 297 Fed. 858, 862, 872.

Donald Thompson, of Pittsburgh, Pa., George Link, Jr., and McKercher & Link, all of New York City, and Calvert, Thompson & Wilson, of Pittsburgh, Pa., for plaintiff.

Percy Allen Rose, of Johnstown, Pa., and H. F. Stambaugh, John M. Freeman, and Watson & Freeman, all of Pittsburgh, Pa., for defendant.

GIBSON, District Judge. The matters calling for decision herein are questions of law raised by affidavit of defense pursuant to the

Pennsylvania Practice Act of May 14, 1915 (Pa. St. 1920, § 17181 et seq.). The facts are substantially as follows:

Prior to September 2, 1920, the plaintiff was negotiating with the defendant for the purchase of a large amount of coal. In those negotiations he was acting as agent of the Framerican Industrial Development Corporation, a New York corporation, which in turn was the agent of Schneider & Co., of Le Creusot, France. On September 2, 1920, the defendant made the following proposal (Exhibit A of statement of claim) to the plaintiff:

"Sept. 2, 1920.

"Mr. Victor Guionnet, 13 E. Thirty-Sixth Street, New York City, N. Y.— Dear Sir: In connection with the contract which you are now negotiating with me on behalf of Schneider & Co., of Le Creusot, France, represented in the United States by the Framerican Industrial Development Corporation, of 21 East Fortieth street, New York City, New York, for the purchase of five hundred thousand (500,000) tons of pool No. 5 and pool No. 7 coal, I hereby agree that in the event of the consummation of that contract, or the present consummation of any contract, with the said company on other pools of coal, to pay to you out of the proceeds realized by me from the sale of the coal covered by any such contract, as received, the sum of fifty ($.50) cents per net ton. And further I agree that, if at any time in the future other contracts for coal are entered into between me and the said company, and you still represent the same in your present capacity, that you shall likewise receive the same commission per ton on all coal delivered under said contract, on the same terms as hereinbefore mentioned; it being understood that all commissions to which you may be entitled will be deposited to your checking credit in the Title, Trust & Guarantee Company of Johnstown, Pennsylvania, duplicate advices of deliveries of coal under the said contract or contracts to be forwarded to you promptly to any address you may designate.

"Truly yours,                                    [Signed]   C. E. Specht.

"Specht Building, 628 Main Street, Johnstown, Pa."

[1] On September 11, 1920, the defendant and the Framerican Industrial Development Corporation entered into a certain agreement for the sale of 500,000 tons of coal by the former to the latter. In it provision was made concerning the price, quality, delivery, and shipping directions of the coal. The following excerpts from the agreement (Exhibit B of statement) are material to our present inquiry:

"Sixth.   *   *   *   Provided, however, that the seller shall not be required to make and maintain said deliveries of coal, if he be prevented from so doing by war or insurrection, strikes, and lockouts, acts of any state or of the United States government, acts of God, or by any other cause not within the control of the seller, and which with ordinary business foresight and prudence he could not have foreseen. And in order that any such cause shall operate as an excuse for nonperformance by the seller, the seller shall immediately upon the existence of any such cause give notice thereof as herein provided to the buyer, and keep the buyer daily informed during the continuance of any such cause or causes.

"In any such event the seller shall only be required hereunder to make such deliveries of coal as conditions may permit; the seller, however, hereby agrees that he will give to the buyer priority up to the tonnage covered hereby over all other contracts present or future for the delivery by him of coal consigned to the said pools No. 5 and No. 7.

"Eighth. The buyer shall immediately upon the delivery of one copy of this agreement, duly executed by the seller, with a bond satisfactory to the buyer thereto attached, advance to the seller on account of the purchase price of said coal one ($1) dollar per net ton, or five hundred thousand ($500,000) dollars in all; the buyer to be credited by the seller out of said advancement

297 F.—55

with the sum of one ($1) dollar on each and every net ton of coal delivered hereunder.

"Ninth. The buyer shall, as soon as possible after the delivery to it of a copy of this agreement, duly executed by the seller, with a bond satisfactory to the buyer, annexed thereto, establish in the Bankers' Trust Company of New York, a rotary credit to cover forty-five (45) days' payment of coal to be delivered hereunder, against which said rotary credit the seller may draw sight drafts each day to cover weight bills and invoices of coal shipped hereunder from day to day, less one dollar per net ton to be credited to the buyer out of the advancement of five hundred thousand ($500,000) dollars hereinbefore mentioned, which sight drafts with the railroad weight bills and invoices attached, the said Bankers' Trust Company. with which the said rotary credit is to be maintained, is hereby authorized to honor and pay. Adjustments of the said rotary credit shall be made by the buyer at the end of each and every month of the period covered hereby, except the last month of said period, during which the buyer shall maintain in the said rotary credit funds sufficient to cover payments of the remainder of the coal to be shipped hereunder.

"Eleventh. The seller shall as soon as possible after the execution and delivery hereof, and before the advancement by the buyer of the said amount of five hundred thousand ($500,000) dollars furnish the buyer a bond in the amount of six hundred and fifty thousand ($650,000) dollars, with good and sufficient surety, conditioned to the performance by him of all the terms, conditions, requirements, and provisions of this contract, and upon the exactness of representations made by the seller herein.

"Fourteenth. Unless the bond mentioned in the contract is delivered and accepted by the buyer, which acceptance must be in writing, and signed by the officer of the buyer who signs this agreement on its behalf, and unless the advance payment be made, and rotary credit be established, this agreement shall be of no effect whatever, and unless all these preliminaries are completed on or before September 17, 1920, this instrument shall be null and void."

On the same day the said agreement was signed, the defendant signed a certain other paper (Exhibit C of statement), wherein he gave to the Framerican Industrial Development Corporation—

"the exclusive right or option to purchase at any time within ten (10) days from the date hereof, two hundred and forty thousand (240,000) net tons * * * of coal * * * on the same terms, provisions and conditions as those embodied in a *draft of a proposed contract* between me and the said optionee this day drawn, covering the purchase and sale of five hundred thousand tons."

It was further provided:

"If the said optionee shall fail to accept this option within the aforesaid period of ten (10) days, the same shall thereafter be null and void and of no further force and effect."

The defendant either could not, or would not, give the bond required by paragraph 11 of the agreement of September 11, 1920, supra, and on October 18, 1920, the Framerican Industrial Development Corporation declared the whole matter at an end. No coal was shipped under the agreement.

On January 6, 1921, the plaintiff filed his statement of claim, wherein he demanded the sum of $370,000. Of this amount, $250,000 was claimed as the total of commissions due him, under defendant's contract of September 2, 1920, supra, upon 500,000 tons of coal alleged to be sold by defendant by the agreement, Exhibit B, of September 11, 1920, between defendant and the Framerican Industrial Develop-

ment Corporation, and $120,000 was the total of commissions alleged to be due also under said contract of September 2, 1920, upon 240,000 tons of coal mentioned in defendant's option of September 11, 1920 (Exhibit C of statement).

In due time the defendant filed his affidavit of defense, wherein he raised certain questions of law pursuant to the Pennsylvania Practice Act of 1915. The affidavit of defense is practically a demurrer to plaintiff's statement. The principal contention of the defendant is that neither the agreement of September 11, 1920, between defendant and the Framerican Industrial Development Corporation, nor the option given by defendant on the same date, was such a "consummation of that contract" as was contemplated by defendant's promise of September 2, 1920, supra, and that no basis was shown for the claim, in view of the fact that no coal whatsoever had been shipped by defendant pursuant to his agreement with plaintiff.

The defendant, in his pleading, further set forth that the statement disclosed the fact that, when the plaintiff received the promise set out in the letter of September 2, 1920, he was acting as agent of the proposed purchaser, not for defendant, and in argument it was contended that such fact rendered his recovery herein contrary to public policy. This double relationship of the plaintiff furnishes a setting to his cause which perhaps adds no luster to it; but we have reached our conclusions upon another phase of the case, and have given little or no consideration to this contention.

After the affidavit of defense was filed, plaintiff amended his statement, whereby he set forth that he was to receive no compensation from the purchaser, and that his arrangement for a commission from the seller was known to the Framerican Corporation (agent of the ultimate purchaser); that the agreement of September 11, 1920 (Exhibit B) was the consummation of "the contract which you are now negotiating with me on behalf of Schneider & Co.," mentioned in agreement of September 2, 1920 (Exhibit A); and that the defendant, prior to the rescission of the agreement by the Framerican Corporation on October 18, 1920, had arranged for a bond for $650,000, which was satisfactory to the purchaser, who stood ready to pay over $500,000 to the defendant, upon delivery of said bond to it, and had arranged for the rotary credit mentioned in Exhibit B.

An examination of the letter or agreement of September 2, 1920, will disclose that defendant agreed:

"* * * In the event of the consummation of that contract [for sale of 500,000 tons of coal to Schneider & Co. through Framerican Corporation] * * * to pay to you [plaintiff] out of the proceeds realized by me from the sale of the coal covered by any such contract, *as received*, the sum of fifty ($.50) cents per net ton."

And as to other future contracts for the sale of coal, between the same parties, defendant agreed that plaintiff should "likewise receive the same commission per ton on *all coal delivered.*"

It is plain that the defendant had in mind a completed sale when he wrote of the consummation of the contract. The plaintiff was to receive his commission "out of proceeds realized," or "on all coal

delivered." We are called upon to determine whether the statement, as amended, shows such a consummation, or such acts or failure to act on the part of defendant as would prevent him from availing himself of nonconsummation as a defense. The statement shows that no coal was ever actually delivered to, or paid for by, the plaintiff or its principal.

An agreement was signed by the defendant and the Framerican Corporation on September 11, 1920, whereby the defendant undertook to sell 500,000 tons of coal at certain prices and under certain conditions. The plaintiff points to this agreement as the contract contemplated when the letter of September 2, 1920 (Exhibit A) was written, and contends that the defendant is prevented from availing himself of the nonperformance of the said contract as a defense, because that nonperformance was occasioned entirely by his own refusal to comply with its terms.

If a principal were to contract with his agent for the payment of a commission to the latter, if he consummated a sale of principal's coal to a purchaser able and willing to comply with the principal's terms, and a complete and enforceable contract for the sale, embodying those terms, were executed by defendant and such purchaser, in the event of nonperformance the agent would doubtless be entitled to recover proper commissions, even though his contract with his principal called for the payment of the commission from amounts paid by the purchaser, provided it were established that the nonperformance was entirely due to the willful and arbitrary refusal of the principal to fulfill his contract of sale. We are required by defendant's statutory demurrer to determine herein whether the contract (Exhibit B) between defendant and the Framerican Corporation was such a final and enforceable contract, and, if so, whether there was such a willful and arbitrary refusal of defendant to comply with its terms as would make him liable to plaintiff for his commission.

An examination of the agreement of September 11, 1920, discloses the fact that it was not, in itself, the final and full arrangement between the parties to it. Before deliveries of coal were to begin, and before payments for coal were to be made, certain things had to be done by the parties, and in the event "all these preliminaries" were not completed before September 17, 1920, the instrument itself was to be null and void. The defendant was required to deliver a bond for $650,000 satisfactory to the Framerican Corporation, and upon delivery thereof that corporation was required to advance to the defendant $500,000 on account of the coal, and to establish a large rotary credit to meet its obligations. Until the buyer had approved a bond for $650,000 presented by defendant, and had paid to defendant $500,000 on account of the coal, and had arranged for a rotary credit satisfactory to the defendant, the minds of the parties had not met, and a contractual relation had not been fully established.

[2] The Supreme Court of Pennsylvania has recently decided two cases which are closely akin to the present case in the principles applied. See Hutchinson Baking Co. v. Marvel, 270 Pa. 378, 113 Atl. 433; Pennsylvania Lubricating Co. v. Wilhelm, 255 Pa. 390, 100

Atl. 93. In the first case mentioned (Baking Co. v. Marvel) the defendant agreed to sell certain condensed milk, "this order subject to approval of a 5-barrel sample, which we will ship at once to you." The sample was not sent, and, on request, defendant refused to do so. Plaintiff bought in the open market, and brought suit for the loss sustained. The following is from the opinion of the court by Mr. Justice Sadler:

"If the agreement to sell was qualified, and something further remained to be done before both vendor and vendee obligated themselves, then no contractual relation was established. 'One party to a contract is not bound thereby, when it does not bind the other party; when there is no liability there is no obligation.' 1 Parsons on Contracts, 486; 1 Page on Contracts, 452. In the present case the company was not required to receive the goods unless the sample should be approved. It is true that the milk was to be of 'government standard,' yet there might be reason why the vendee would be justified in refusing to accept it, though the sample disclosed the percentage of solids required by that test. Until the vendee agreed to take the milk of the quality which the vendor was prepared to sell, there was no completed contract.

"An acceptance of an offer must be unqualified to be effective. If new conditions be added, unless they relate to immaterial matters, or are such as are implied in law (Morse v. Tillotson & Wolcott Co., 253 Fed. 340), no liability is created, and such was the situation here. This was not a sale, subject to buyer's inspection (Sloan Corporation v. Linton, 260 Pa. 569), but the determination of the quality by the purchaser was a condition precedent to the formation of a definite understanding. The case falls squarely within the ruling of this court in Pa. Lubricating Co. v. Wilhelm, 255 Pa. 390, and it is unnecessary to repeat the reasoning there applied—a mere reference to that decision will suffice.

"It is suggested the proposed vendor was in default in not submitting his samples. That is so, but it does not alter the situation. 'Since there can be no contract without an offer and acceptance, the fact that the offerer by evasion prevents an acceptance of his offer will not cause a contractual relation to be established.' 13 C. J. 294. The learned court below was correct in the view taken, and properly sustained the statutory demurrer."

Lubricating Co. v. Wilhelm, 255 Pa. 393, 100 Atl. 93, was based upon substantially the same facts as Baking Co. v. Marvel, supra; the order being "subject to approval of sample drawn from bulk, when submitted." The proposed purchaser brought suit for damages incurred, the defendant having failed to send sample or product ordered. The following is quoted from the opinion of the court, by Mr. Justice Walling:

"This is not the case of a sale of property subject to the buyer's inspection when delivered; if so, the contract would be valid. Conrad v. Penna. R. R. Co., 214 Pa. 98. Nor is it an agreement that the article sold should be satisfactory to the buyer; but it is an agreement that, as part of the sale and in advance of the delivery of the commodity, its quality shall be determined by the purchaser's approval of the sample. Certainly defendant could not compel plaintiff to accept the grease without its previous approval of a sample thereof.

"Defendant's letter showing that the grease in question was not in his possession, before he would be liable, if at all, for not furnishing plaintiff with a sample thereof it should appear that such failure was due to some default on his part. And it is not shown that plaintiff would have approved such sample had it been furnished, or what, if any, damage it sustained by losing the opportunity of deciding whether it would accept or reject the

sample. If a contract be invalid because incomplete, it is not made valid by the neglect or refusal of one party thereto to do that which would enable the other party at his option to render it complete. And if the contract be still invalid there is no basis for a recovery of damages because of defendant's neglect to furnish the sample in question."

In the present case no sample of coal, the subject-matter of the sale, was to be forwarded to the purchaser for his approval, it is true; but a bond was to be submitted for approval, and until so submitted and approved, the purchaser was not bound. This fact defeats the recovery of the plaintiff herein, because both parties must be bound to constitute a contract. That the minds of the parties had not fully met in a completed agreement is apparent from an examination of the fourteenth paragraph. It mentions the proposed bond, the following payment, and establishment of a rotary credit, and then provides that, unless "all of these preliminaries" are completed by a certain date, the agreement was to be null and void. It was recognized that either buyer or seller might not be able to perform the preliminary conditions required to complete the agreement, and each protected himself in case of failure. If the fourteenth paragraph was not intended to have such effect, it is hard to explain the reason for its existence in the paper.

[3] We are of opinion that plaintiff's claim for commissions based upon the alleged contract of sale of 500,000 tons of coal, dated September 11, 1920, has no proper foundation. It is very much more substantial, however, than his claim for commissions based upon the option (Exhibit C of statement), also dated September 11, 1920, by which the defendant granted to the Framerican Corporation an option to purchase 240,000 tons of coal within a fixed time. This option was not dependent upon the agreement for the sale of 500,000 tons of coal, hereinbefore discussed, and was never accepted by the optionee. Nevertheless the plaintiff claims commissions on the 240,000 tons of coal mentioned therein, because, as he says in substance, the Framerican Corporation would have accepted the option, had not defendant defaulted in the agreement relative to the 500,000 tons. As we view it, this claim is too visionary to constitute a proper basis for recovery.

Plaintiff's statement sets forth no cause of action, and an order will therefore be drawn entering judgment for defendant.